IRVINE LAW GROUP LLP
S. Ron Alikani (SBN 206939)
ralikani@irvinelawgroup.com
780 Roosevelt
Irvine, California 92620
Telephone:   (949) 653-6153
Facsimile:   (949) 653-1277

Attorneys for Plaintiffs James Estakhrian.
Abdi Naziri, all others similarly situated

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
## SOUTHERN DIVISION

| | |
|---|---|
| JAMES ESTAKHRIAN and ABDI NAZIRI, on behalf of themselves and all others similarly situated,<br><br>            Plaintiffs,<br><br>        v.<br><br>MARK OBENSTINE, BENJAMIN F EASTERLIN IV, TERRY A.COFFING, KING & SPALDING, LLP, and MARQUIS & AURBACH, P.C.,<br><br>            Defendants | Case No.: CV11-3480 GAF (CWX)<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR:**<br><br>**ATTORNEY MALPRACTICE; BREACH OF FIDUCIARY DUTY; BREACH OF CONTRACT; UNFAIR COMPETITION; UNFAIR BUSINESS PRACTICES; AND FRAUD**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs James Estakhrian and Abdi Naziri, on behalf of themselves and all others similarly situated, complain against Mark Obenstine, Benjamin F Easterlin IV, Terry A. Coffing, King & Spalding, LLP, and Marquis & Aurbach, P.C. as follows:

## NATURE OF THE ACTION

1.     This is a case of attorney malpractice, fraud and other wrongdoing

brought about by a concealed conflict of interest and other ethical violations on the part of King & Spalding, LLP, one of the largest law firms in the United States, Benjamin F Easterlin IV a partner in that law firm, and their co-counsel.  Plaintiffs and the proposed class members placed approximately $250.0 million in earnest money deposits for the purchase of condominium units in a development known as the Cosmopolitan Resort and Casino Las Vegas ("Cosmopolitan"), in Las Vegas, Nevada.  Defendants represented members of the proposed class in litigation claiming breach of contract in connection with their condominium purchases, seeking, among other things, a return of their deposits.

2.     Defendants encouraged plaintiffs and members of the proposed class to settle the litigation for a fraction of their deposits, and the litigation was settled on that basis.  Unbeknownst to plaintiffs, however, Easterlin and King & Spalding, who had not entered an appearance in the Cosmopolitan litigation but nonetheless acted as counsel and directed the litigation, had a massive and direct conflict of interest because of their representation of Deutsche Bank, whose wholly-owned subsidiary had become the owner of Cosmopolitan.  Thus, defendants in general, and Easterlin and King & Spalding in particular, were in a position to know and did know important facts about the controversy which they failed to disclose and which they concealed from plaintiffs and members of the proposed class due to the conflict of interest.  The main undisclosed and concealed fact was that the Cosmopolitan owner did not intend to complete the project as a condominium-casino project, but rather as a hotel-casino project.  This fact alone demonstrated that the owner did not intend to, and could not, fulfill the terms of the condominium purchase agreements with plaintiffs and the members of the proposed class, thereby requiring return of the earnest money deposits in full.

3.     In their misdirected zeal to persuade plaintiffs and the members of the proposed class to settle the Cosmopolitan litigation for an unjust discounted sum, defendants used cappers and runners to urge plaintiffs and class members to settle

SECOND AMENDED COMPLAINT FOR DAMAGES

for far less than the fair settlement value of the case.  The key capper posed as a Cosmopolitan condominium purchaser and assumed the pseudonym "Kay Jackson" to do the unethical bidding of defendants.  At defendant's direction and under their review, she ran a website and blog and posted hundreds of communications to convince plaintiffs and proposed class members to settle on the unjust basis proposed by defendants.  The tactics employed by defendants through the cappers and runners included a malicious campaign against competing counsel who were attempting to litigate the Cosmopolitan claims or hold out for a better settlement, the ballyhooing of defendants as a "dream team" of lawyers that had the best interests of plaintiff and the proposed class at heart, and the purveying of incomplete, inaccurate, and misleading facts about the state of the controversy.

## PARTIES

4.      Plaintiff James Estakhrian is and has been a resident of Orange County, California at all times relevant to the complaint.

5.  Plaintiff Abdi Naziri, also known as Alex Naziri, is and has been a resident of Orange County, California at all times relevant to the complaint. In October, 2005, Naziri signed a standard form Purchase and Sale Agreement and put down a deposit toward the purchase of a unit in the East Tower of the Cosmopolitan.

6.  Defendant Mark Obenstine is an attorney and a member of the Bar of the State of California.  He resides in the State of Nevada.  At the time that plaintiff Estakhrian and the proposed class members signed retainer agreements with Obenstine in connection with the Cosmopolitan litigation and at all relevant times thereafter, Obenstine resided in the Los Angeles, California area and maintained a business address at 4533 MacArthur Boulevard, Suite 108, Newport Beach, California 92660.

SECOND AMENDED COMPLAINT FOR DAMAGES

7.     Defendant Benjamin F. Easterlin IV is an attorney and is a member of the Bar of the State of Georgia. He resides in the State of Georgia.  He is a partner in the defendant law firm King & Spalding, LLP, and works in its Atlanta, Georgia office.

8.     Defendant Terry A. Coffing is an attorney and is a member of the Bars of the States of Nevada and Minnesota.  He resides in the State of Nevada.  He is a partner in the defendant law firm Marquis & Aurbach, P.C., and works in its Las Vegas, Nevada office.

9.     Defendant King & Spalding, LLP is an international law firm and a limited liability partnership.  It is one of the largest law firms in the United States, with over 800 lawyers. King & Spalding is based in Atlanta, Georgia.  King & Spalding maintains offices in and does business in the State of California.

10.    Marquis & Aurbach, P.C. is a law firm and a professional corporation with offices in Las Vegas, Nevada.

## JURISDICTION AND VENUE

11.    This Court has original jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a class action in which (1) there are more than 100 members in the proposed class, with the final number expected to exceed 1,000; (2) plaintiffs and approximately half of the proposed class members are citizens of California and have a different citizenship from defendants, or at least one or more of them; and (3) the claims of the individual proposed class members, when aggregated, exceed the sum or value of $5,000,000.00, exclusive of interest and costs.

12.    The Central District of California has personal jurisdiction over defendants because each defendant has done and does business in California and in

SECOND AMENDED COMPLAINT FOR DAMAGES

4

this district, and because many of the acts complained of and giving rise to the claims alleged occurred in California and in this district.

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(c) because plaintiffs resided in this district during the events giving rise to the claims, and because a substantial part of the events giving rise to the claims occurred in this district.  **Intradistrict assignment:**  Assignment to the Western Division of the Central District Court of California is proper because a substantial part of the events and the injury giving rise to these claims have occurred in Orange County, where defendants solicited clients and enter into legal service agreements.

## ADDITIONAL FACTUAL ALLEGATIONS
### A. The Cosmopolitan Development

14.     The Cosmopolitan, located in the heart of the Las Vegas Strip, was promoted as a project consisting of a West Tower with more than 1,300 luxury residential condominium units and an East Tower with more than 700 such units. The towers also were to contain a 75,000 square foot casino, an 1,800 seat theater, and a rooftop beach club.  The purchasers of the condominium units, including the proposed class members here, signed Purchase and Sale Agreements in 2005 and 2006, and made earnest money deposits on their purchases totaling approximately $250.0 million, or $140,000 apiece on average.

15.     The developer of the Cosmopolitan, 3700 Associates LLC, projected that the condominium units would be ready for occupancy by early 2008.  However, 3700 Associates LLC defaulted on its construction loan with Deutsche Bank, which then foreclosed on the property in March 2008.  Following the foreclosure, Nevada Property 1, LLC, a wholly-owned subsidiary of Deutsche Bank, acquired the property and all rights and obligations under the Purchase and Sale Agreements.

SECOND AMENDED COMPLAINT FOR DAMAGES

16.     The construction schedule for the project slipped significantly and for long periods of time construction on portions of the project was halted.  In 2009, the owner introduced interior design changes, amid allegations that the project was being turned into a hotel, without the condominium development.  By the time the Cosmopolitan opened in December 2010, the condominium development had been abandoned, and the structures that had been sold as condominiums were converted to hotel rooms.

## B. Defendants' Representation of Plaintiff and the Class

17.     Prior to their representation of plaintiffs and members of the proposed class here, some of the defendants acted as counsel in a case involving another Las Vegas real estate development.  In 2008, defendants Obenstine, Easterlin, and King & Spalding filed a class action complaint on behalf of purchasers of condominium units in Trump Tower in Las Vegas, Nevada for return of their deposits. Obenstine, Easterlin, and King & Spalding were attorneys of record.  Donna Billiter, one of the homeowners and a class action representative, contacted various condominium purchasers and persuaded them to retain Obenstine, Easterlin, and King & Spalding as their attorneys.  As a result, hundreds of condominium purchasers in the Trump Tower signed a retainer agreement with Obenstine and each paid a retainer deposit of $1,500 or more. To plaintiff's knowledge, the Trump Tower class action is still pending.

18.     In or about October 2008, Obenstine, Easterlin, and King & Spalding, using the same client-finding tactics, began soliciting purchasers of condominiums in the East and West Cosmopolitan towers, seeking to represent them in an action to recover their purchase deposits.

19.     Plaintiffs are informed and believe that over 500 condominium unit purchasers signed retainer agreements like the one signed by plaintiff Estakharian on March 3, 2009, which is annexed to this complaint as Exhibit A.  The

SECOND AMENDED COMPLAINT FOR DAMAGES

agreement is a contingency fee agreement with a sliding scale of fees owing to the attorneys if there is a recovery on behalf of the client (Paragraph 3).  The object of the retention was to rescind the Purchase and Sale Agreements and obtain a return of the escrow deposits, with interest (Paragraph 1).  The agreement required payment by the client of a retainer check in the amount of $1,000.00 for each condominium unit, as an advance against the costs of the lawsuit (Paragraph 5).  The agreement was signed by Obenstine as the attorney.  The agreement described a fee-sharing agreement between Obenstine and defendant Marquis & Aurbach (Paragraph 10), but there is no mention in the agreement of either Easterlin or King & Spalding.

20.    On February 11, 2009, defendants Coffing and Marquis & Aurbach filed a class action lawsuit in Clark County, Nevada state court on behalf of the class of Cosmopolitan condominium unit purchasers, including plaintiffs and the proposed class members, seeking to rescind their purchase contracts and to obtain a refund of their escrow deposits, alone with interest earned.  *Daniel Watt, et al. v. Nevada Property 1, LLC, et al.,* Case No. A582541.  Defendants also directed California counsel to file a similar class action complaint in California state court on behalf of California resident purchasers only, and that lawsuit was filed on March 18, 2009, in Santa Clara County Superior Court.  *Brian Stone, et al. v. 3700 Associates, LLC et al.,* Case No. 109CV137596.

21.    Despite the absence of any mention of Easterlin or King & Spalding in the retainer agreement with plaintiffs and the proposed class members, Easterlin and King & Spalding played a prominent role acting as attorneys for plaintiff and the proposed class from the time leading up to the formation of the lawsuit through its conclusion, including but not limited to the following actions:

     a.  Easterlin was the principal architect and strategist for the action;

     b.  Easterlin and King & Spalding, despite not having entered an appearance in the case, acted as attorneys for plaintiffs and the class

SECOND AMENDED COMPLAINT FOR DAMAGES

7

throughout the litigation by directing litigation and settlement strategy, and by participating in all aspects of the litigation except for appearances before the court and a formal appearance in the case;

c.  Through the actions of cappers and runners as described below, the presence of Easterlin and King & Spalding as counsel, and in particular the depiction of Easterlin as being one of the lead counsel, was used as a drawing card to persuade plaintiff Estakhrian and proposed class members to join the action;

d.  Easterlin and King & Spalding entered into undisclosed fee-sharing agreements with the other defendants;

e.  Easterlin along with the other defendants devised the settlement strategy in the action; and

f.  Easterlin directed, advised, commented on, and provided other input, with respect to communications from the cappers and runners described below to plaintiffs and the proposed class members, including but not limited to the communications disparaging other counsel, persuading plaintiffs and the proposed class members that they should accept settlement as recommended by defendants, and discouraging plaintiffs and the proposed class members from opting out or continuing to seek more relief than provided by the settlement.

## C. Defendants' Conflict of Interest

22.    Easterlin and King & Spalding had and have a direct conflict of interest preventing them from representing plaintiffs and the proposed class members.  The conflict of interest arises from King & Spalding's representation of Deutsche Bank, the ultimate owner of the Cosmopolitan development.  King & Spalding's representation of Deutsche Bank occurred at all relevant times during which

SECOND AMENDED COMPLAINT FOR DAMAGES

Easterlin and King & Spalding were acting as attorneys for plaintiffs and the proposed class members.

23.    The conflict of interest prevented Easterlin and King & Spalding from undertaking any of their actions alleged in Paragraph 21 above.  They took those actions anyway, in the face of the conflict of interest.  Their actions were knowing and voluntary, and taken with full knowledge of, and in conscious disregard of, the direct conflict of interest.  The conflict of interest prevented them from acting with undivided interest on behalf of plaintiffs and the proposed class members, and caused them to act in the interest of Deutsche Bank to the detriment of the interest of plaintiffs and the proposed class members.

## D. Defendants' Other Ethical Improprieties

24.    On September 14, 2008, Kay Jackson, with a given address of 8635 W. Sahara Apt. 596, Las Vegas, Nevada 89117, registered a website with the domain name of Cosmopolitanpolitanownerslv.com.  The website, administered by Kay Jackson, was created to solicit and retain clients on behalf of defendants with regard to the Cosmopolitan litigation.

25.    Kay Jackson directly contacted condominium purchasers, forwarded Obenstine's retainer agreement on Obenstine's behalf, and persuaded Cosmopolitan purchasers to sign the agreement and pay a retainer deposit to Obenstine.  As a result, hundreds of proposed class members signed a retainer agreement.

26.    On or about February 24, 2009, Kay Jackson contacted plaintiffs on behalf of defendants, in an attempt to induce them to join the Cosmopolitan lawsuit.  She forwarded to plaintiffs the Obenstine retainer agreement, as well as Easterlin's biography from the King & Spalding website, and identified Easterlin as one of as of the lead attorneys involved in the Cosmopolitan action.

SECOND AMENDED COMPLAINT FOR DAMAGES

27.     Later, in June 2010 when she was contacting Cosmopolitan purchasers on behalf of defendants to persuade them to join "our new action" described below, Kay Jackson responded to an email from one of the prospective participants who asked who was heading up the lawsuit.  In an email dated June 25, 2010 from "kay Jackson [mailto:lucke.13@live.com]," she stated:

"Mark Obenstine is heading up the litigation along with Ben Easterlin at King and Spalding.  Just like the last time.  I am orgainzing [sic] the group."  The "last time" is a reference to the Cosmopolitan litigation (*Watt* and *Stone*).

28.     Kay Jackson claimed that she was a purchaser of a condominium unit in Cosmopolitan.  No such name appears on the rolls of purchasers of the Cosmopolitan units.  On information and belief, her statement that she was a Cosmopolitan condominium purchaser is false.

29.     Kay Jackson apparently is a pseudonym for Donna Billiter.  In providing her telephone contact in connection with the registration of the cosmopolitanownerslv.com website, Kay Jackson gave her telephone number as (702) 604-7960.  In an email from donnabilliter@aol.com on June 7, 2008 to the purchasers in the Trump Tower litigation, Donna Billiter gave her telephone number as (702) 604-7960.  Donna Billiter owns Maverick Services, Inc., a company incorporated in Nevada in late 2009, which may be involved in the actions of Kay Jackson and Donna Billiter described here.

30.     From October 2008 through December 2010, the cosmopolitanownerslv.com website generated 675 posts from 368 persons, in over 400 pages of messages.  Kay Jackson generated approximately half of the total posts, and approximately 25 percent of the posts were generated by Sanjay "Sonny" Varma, a purchaser and class representative in the Cosmopolitan litigation, who sent messages from srfntm@gmail.com.  Collectively, the messages from Kay Jackson and Sanjay Varma vouched for the defendants, disparaged competing attorneys, encouraged purchasers to join the Cosmopolitan litigation

conducted by defendants, and encouraged them to join in the settlement of the case when settlement was proposed.  The messages from Kay Jackson on the cosmopolitanownerslv.com website, along with email communications sent to plaintiff and class members, include the following:

    a. September 20, 2008:  In referring to defendants Obenstine, Easterlin, and King & Spalding, she stated; "the attorneys representing the Trump group have looked at our documents to some degree and have identified some causes of action to rescind the contract. They have told me it is very similar to the Trump case only better."

    b. October 11, 2008:  As one example of Kay Jackson's efforts to recruit Cosmopolitan purchasers for the lawsuit on behalf of defendants, she complimented Sanjay Varma's "skills on the internet" and stated:  "if anyone else can bring something to the table to make our numbers greater, call me or email me."

    c. December 8, 2008:  In further reference to the recruitment of purchasers, she stated:  "our numbers are growing, slowly, but they are still growing. I am signing people all by myself …."

    d. January 25, 2009:  Prior to the filing of the *Watt* lawsuit, she wrote in support of defendants ("smart and aggressive and have the resources to go all the way") and against competing attorneys ("other attorneys are hopping on the band wagon and trying to break up our group for their own gain"; "bottom feeding for clients").

    e. February 15, 2009:  After the *Watt* suit was filed, she provided an update to explain that Marquis & Aurbach was added as attorneys because that firm was needed to navigate through the Nevada courts. In referring to the addition of Marquis & Aurbach to the team, she stated:  "They also have an excellent reputation so our 'Dream Team' of attorneys are even stronger now."

SECOND AMENDED COMPLAINT FOR DAMAGES

f.  October 25, 2009:  In referring to attorneys who were representing three people not part of the class settlement in *Watt*, she said: "However, since they are actively working to derail the settlement and calling us to try to get us to jump ship, not take the settlement, and go with them, they may be disqualified by the court and if that happens they will not be allowed to represent anyone including their own clients."

g.  November 4, 2009: Kay Jackson sent an update to East Tower purchasers who might feel that they were "being left out in the cold with all the recent activity with the settlement with the West tower." In referring to "our attorneys," she assured that she had "met with Ben Easterlin and Mark Obenstine last week" and that "[t]he answers from Mr. Easterlin and Mr. Obenstine were very positive."

h.  November 26, 2009:  In a message to discourage class members from talking with attorneys attempting to talk them into opting out of the class settlement, she wrote that the attorneys were "bottom feeding for clients," "working the angles," "are also saying anything and everything to get people not to take the settlement and sign up with them," and are "pretty underhanded."

i.  January 24, 2010:  In referring to defendants' law firms, she stated: "What we ended up with was three very established and well respected law firms …."

31.    The actions of Kay Jackson and Sanjay Varma described here were under the direction of, with the approval of, and with the participation of defendants, particularly defendants Obenstine and Easterlin.  In undertaking their actions described here, Kay Jackson and Sanjay Varma acted as cappers or runners for defendants, that is, they acted as agents for defendants in the solicitation or procurement of business for defendants.  Kay Jackson as a capper or runner

SECOND AMENDED COMPLAINT FOR DAMAGES

12

additionally solicited Sanjay Varma to commit or join in such solicitation on behalf of defendants.

### E. <u>Settlement of the Cosmopolitan Litigation</u>

32.     Defendants negotiated a settlement with the Cosmopolitan defendants on a classwide basis.  On October 21, 2009, notice of class settlement for purchase agreements in the West Tower was issued, and on February 24, 2010, notice of class settlement for purchase agreements in the East Tower was issued.  Fairness hearings were conducted on December 14, 2009 with respect to the West Tower and on April 6, 2010 with respect to the East Tower, and the court gave final approval to the settlements shortly thereafter.  Defendants represented that the settlement resulted in West Tower purchasers receiving an amount equal to 64.4% of their escrow deposits.  The settlement notice for the East Tower settlement stated that those purchasers' total recovery after attorneys' fees and costs was 60.2% of the principal escrow deposit, less a $350 escrow cancellation fee.

33.     In presenting the settlement to the proposed class and the court, including the class notice, defendants did not disclose the involvement in the case and in the settlement process of Easterlin and King & Spalding, and did not disclose the conflict of interest of those defendants.  Also, defendants did not disclose the information they possessed due to the representation of Deutsche Bank by King & Spalding.  Nor did defendants disclose their direction of, approval of, and participation in the actions of Kay Jackson and Sanjay Varma described here.  All of these matters had an adverse material effect on plaintiff and the proposed class members.

34.     Plaintiffs relied upon the representations and omissions of defendants and Kay Jackson in deciding to accept the settlement and not opt out of the lawsuit.

SECOND AMENDED COMPLAINT FOR DAMAGES

### F. <u>Failure to Return Retainers</u>

35.     Despite the settlement of the case, plaintiff Estakhrian and other members of the class who signed a retainer agreement with Obenstine did not receive reimbursement of all of their $1,000 retainer deposits.  Expenses were paid as part of the settlement of the case, and defendants were required to return the retainer deposits and did not return all of those deposits.  In the case of plaintiff Estakhrian and other class members, defendants without contractual or legal basis retained $250 of the retainer deposit as an "administrative fee."  Plaintiff Estakhrian received his partial refund at his home in this district.  Defendants provided no explanation of the basis for the charge of the "administrative fee."

36.     Upon information and belief, many of the class members received no refund of their $1,000 retainer deposit from defendants.  Others received a partial refund only after repeated requests.

### G. <u>Plaintiffs' Discovery</u>

37.     By letter dated April 26, 2010, Obenstine wrote to plaintiffs and others who had accepted the settlement in the Cosmopolitan litigation, proposing a new lawsuit against the defendants in that case to recover the balance of the escrow deposits not recovered in the settled action, plus punitive damages.  The theory of the proposed new action, and the rationale for circumventing the release of claims in the class settlement, was that the Cosmopolitan defendants had engaged in "intentional misconduct and fraudulent concealment."

38.     The new action was filed on March 4, 2011 in state court in Clark County, Nevada, *Kristoffer Williamson et al. v. Deutsche Bank, et al.*, Case No. A-11-636407-C.  The alleged misrepresented and concealed facts related to undisclosed reasons for construction delays and undisclosed major design changes

SECOND AMENDED COMPLAINT FOR DAMAGES

to the condominium units indicating that the units were being constructed as hotel rooms, not as residential units.

39.     As with the prior action, defendants Easterlin and King & Spalding did not enter an appearance in the case.  However, their role as attorneys for the plaintiffs and the proposed class in the new action was and is the same as in the prior action.

Plaintiff Estakhrian

40.     After being asked to join the new action, plaintiff began to investigate the questions of how and why the new plaintiff group could pursue recently released claims for the remainder of the escrow deposits, and how defendants, in the words of Obenstine's April 26, 2010 letter, could have been "working to perfect a legal strategy" to collect the remainder of the escrow deposits "[o]ver the last several months," even prior to the conclusion of the settlement of the first action.

41.     Around June 2010, plaintiff discovered that King & Spalding represented Deutsche Bank, and therefore was subject to a conflict of interest.  Plaintiff also discovered that there is no such person as Kay Jackson on the public records of Cosmopolitan condominium purchasers.  These discoveries led plaintiff to believe that defendants and Kay Jackson misrepresented and concealed facts to induce Cosmopolitan class members to settle their claims for a portion of the value of their escrow deposits.

42.     The irony of the allegations in the *Williamson* case is that it is defendants who, because of the direct conflict of interest of their lead attorneys, knew but failed to disclose to their clients, facts about the construction of the Cosmopolitan condominium project, the disclosure of which would have led plaintiff and the proposed class members to recover the full and fair value of their claim.

Plaintiff Naziri

43.Plaintiff Naziri reviewed all of the materials provided by Class Counsel and the Court regarding the settlement of the initial class action. Relying on those

SECOND AMENDED COMPLAINT FOR DAMAGES

representations and the fact the Court had approved the settlement, and knowing nothing about the involvement of Easterlin or King & Spalding or their conflicts of interests, he did not opt out of the settlement and received a payment of approximately $89,000, significantly less than the deposit he had paid. Plaintiff Naziri did not become aware of and could not reasonably have discovered the further fraud committed by Defendants more than three years prior to the filing of this action.

## H. Harm to Plaintiffs and Proposed Class Members

44.     As a result of the actions of defendants and each of them alleged here, plaintiffs and members of the proposed class have suffered injury, including substantial monetary loss.  But for the actions of defendants alleged here, plaintiffs and the proposed class members would have recovered at least the full value of their escrow deposits, plus interest.

## CLASS ACTION ALLEGATIONS

45.     Pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), plaintiffs bring this case as a class action on behalf of all  class members who accepted settlement in the Cosmopolitan litigation and did not opt out of the settlement, except for Sanjay Varma who is excluded from the proposed class due to the matters described here, and on behalf of a subclass of those who did not receive a full refund of their retainer deposit from defendants.

46.     The number of individuals in the class is so numerous that joinder of all members is impracticable, and exceeds 1,000.  It would be impracticable to bring all—or even a substantial percentage of—such persons before the Court as individual plaintiffs through joinder.

SECOND AMENDED COMPLAINT FOR DAMAGES

47.     Common questions of law and fact exist as to members of the class.  The overarching question of law and fact that is common to all members of the class is whether defendants have failed in their professional and fiduciary duties to plaintiffs and the proposed class members because of a conflict of interest and because of other ethical improprieties alleged here.  There are numerous sub-issues of law and fact that are common to all members of the class, including, but not limited to, the following:

  (a)   Whether defendants violated the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*, by their acts and omissions alleged here;

  (b)   Whether defendants violated Cal. Bus. & Prof  Code § 6152 when they engaged Kay Jackson and Sanjay Varma to perform the actions alleged here;

  (c)   Whether Defendants violated the California Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.*, by misrepresenting the nature of their professional services, failing to disclose the conflict of interest, and acting in the face of that conflict of interest;

  (d)   Whether defendants defrauded plaintiffs and the proposed class members by their acts and omissions alleged here;

  (e)   Whether defendants breached their contract and contractual duties toward plaintiffs and the proposed class members in connection with the Cosmopolitan litigation and settlement; and

  (f)   Whether defendants breached their contract and contractual duties toward plaintiff Estakhrian and the proposed class members who did not receive a full refund of their retainer deposits.

48.     Plaintiffs' claims are typical of the claims of all class members because (1) they all have been adversely affected by defendants' breach of contract, conflict of interest, and unethical and tortious actions that deprived plaintiff and the proposed class members of the opportunity to recover the full and fair value of their claim for the refund of their escrow deposits with interest, and (2) their claims are all based on the same legal theory or theories.

49.     Each of the Plaintiffs will fairly and adequately represent the interests of the class because: (1) he is willing and able to represent the proposed class and has

SECOND AMENDED COMPLAINT FOR DAMAGES

every incentive to pursue this action to a successful conclusion; (2) his interests are not antagonistic to those of the other class members; and (3) he is represented by counsel experienced in litigating complex class actions.

50.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(3).  The common questions of law and fact identified above predominate over questions affecting only individual members.  A class action is superior to other available methods for the fair and efficient adjudication of this litigation.  Requiring each class member to pursue his or her claim individually would entail needless duplication, might result in inconsistent judgments, and would waste the resources of both the parties and the judiciary.  Moreover, the financial burden of proving that defendants violated the law as alleged here also would make the prosecution of individual actions virtually impossible for most, if not all, members of the class.

## FIRST CAUSE OF ACTION FOR  PROFESSIONAL MALPRACTICE

### (Against All Defendants)

51.     Plaintiffs reallege the allegations contained in all preceding paragraphs.

52.     Defendants acted as attorneys for plaintiffs and the proposed class members in the Cosmopolitan litigation, irrespective of whether or not they all entered an appearance in the case.

53.     Defendants had a duty to exercise ordinary care, skill and diligence in carrying out their responsibilities to plaintiff and the proposed class members, including complying with the ethical and other standards of the legal profession.

54.     Because of their actions and omissions alleged here, defendants failed to exercise ordinary care, skill, and diligence while representing and advising plaintiff and the proposed class members and thus were negligent.

55.     As a direct and proximate result of defendants' negligence, plaintiff and the proposed class members have been damaged as described here, and are entitled to recover damages, as well as a disgorgement of fees retained by defendants.

SECOND AMENDED COMPLAINT FOR DAMAGES

## SECOND  CAUSE OF ACTION FOR  BREACH OF FIDUCIARY DUTY

### (Against All Defendants)

56.    Plaintiffs reallege the allegations contained in all preceding paragraphs.

57.    A relationship of special trust and confidence existed between defendants, on the one hand, and plaintiffs and the proposed class members, on the other hand, by virtue of the defendants' professed special skill, knowledge, and expertise, the attorney-client relationship existing between them, the relationship of mutual confidence, and the established course of dealing between them.

58.    As a result of this special relationship of trust and confidence and the attorney-client relationship existing between defendants and plaintiffs and the proposed class members, defendant owed to plaintiffs and the proposed class members a fiduciary duty of loyalty, utmost good faith, competence, and diligence.

59.    Because of their actions and omissions alleged here, including but not limited to the failure to disclose the conflict of interest and acting in the face of that conflict of interest, withholding material information from the court, plaintiffs and the proposed class members in the Cosmopolitan litigation, misleading plaintiffs and the proposed class members as to the fairness of the Cosmopolitan settlement, and unethically and unlawfully engaging cappers and runners, defendants breached their fiduciary duties to plaintiffs and the proposed class members, and failed to competently and diligently carry out their responsibilities.

60.    As a direct and proximate result of defendants' breach of fiduciary duties, plaintiffs and the proposed class members have been damaged as described here, and are entitled to recover damages, as well as a disgorgement of fees retained by defendants.

//

//

SECOND AMENDED COMPLAINT FOR DAMAGES

## THIRD CAUSE OF ACTION FOR  BREACH OF CONTRACT

### (Against All Defendants by Plaintiff Estakhrian)

61.     Plaintiff Estakhrian realleges the allegations contained in all preceding paragraphs.

62.      In their retainer agreement with plaintiff Estakhrian and members of the proposed class, defendants committed and were obliged to provide representation in accordance with the agreement and in accordance with the standards of the legal profession.  Additionally, contained within the agreement was the implied covenant of good faith and fair dealing, requiring that neither party do anything that would injure the right of the other to receive the benefits of the agreement. The covenant imposes upon each party the obligation to do everything that the contract presupposes they will do to accomplish its purpose.

63.     Because of their actions and omissions alleged here, defendants breached their contract and contractual duties toward plaintiff, and breached the implied covenant of good faith and fair dealing.

64.     As a direct and proximate result of defendants' breach of contract, plaintiff and the proposed class members have been damaged as described here, and are entitled to recover damages, as well as a disgorgement of fees retained by defendants.

65.     Additionally, plaintiff and those proposed class members who did not receive a full refund of the $1,000 retainer deposit paid to defendants are entitled to reimbursement.

66.     The retainer agreement and the settlement of the Cosmopolitan litigation obligated defendants to refund in full the $1,000 retainer amounts paid by plaintiff and members of the proposed class.  For plaintiff and many of the proposed class members, defendants failed and refused to refund all or any of the retainer amounts.  As a result, defendant breached the retainer agreement and damaged plaintiff and each class member in any amount less than $1,000 that they received.

SECOND AMENDED COMPLAINT FOR DAMAGES

Plaintiff and the proposed class members are entitled to recover these unpaid amounts, with interest.

## FOURTH CAUSE OF ACTION FOR VIOLATION OF CALIFORNIA UNFAIR COMPETITON LAW (Cal. Bus. & Prof. Code §§ 17200 *et seq.)*

### (Against All Defendants)

67.   Plaintiffs reallege the allegations contained in all preceding paragraphs.

68.   Defendant's acts and omissions alleged here violate the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*  Section 17200 prohibits unfair competition by engaging in, among other things*,* any unlawful or unfair business acts or practices.

69.   Defendants committed acts of unfair competition, as defined by the Unfair Competition Law, by, among other things, engaging in the acts and omissions alleged here.  Also, defendants committed such acts and omissions with the intent and objective of gaining an unfair competitive advantage over other attorneys that compete with defendants for legal work, as evidenced by the false and malicious statements made by defendants' agents with regard to competing attorneys in the Cosmopolitan litigation.

70.   Defendants engaged in acts and omissions in violation of the Unfair Competition Law by violating, among others, Cal. Bus & Prof Code § 6152, which prohibits the engagement of cappers and runners for any attorney or to solicit business for any attorney, and Nev. Rev. Stat. Ann. § 7.045, which contains similar prohibitions.

71.   As a direct and proximate result of defendants' acts and omissions alleged here, plaintiffs and the proposed class members have suffered and continue to suffer direct and substantial injury, and defendants received and continue to hold, and to unlawfully profit from, ill-gotten gains rightfully belonging to plaintiffs and the proposed class members.

SECOND AMENDED COMPLAINT FOR DAMAGES

72.     Plaintiffs and the proposed class members are entitled to restitution pursuant to the Unfair Competition Law in the amounts unlawfully received and held by defendants, with interest, as well as an award of attorneys' fees and the costs of this action.

## FIFTH CAUSE OF ACTION FOR VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT
### (Cal. Civ. Code §§ 1750 *et seq.*)

**(Against All Defendants)**

73.     Plaintiffs reallege the allegations contained in all preceding paragraphs.

74.     By their actions and omissions alleged here, defendants engaged in unfair methods of competition and unfair or deceptive practices or acts in their representation of plaintiffs and the proposed class members, in violation of the California Consumers Legal Remedies Act.  Specifically, and without limitation, defendants by their failure to disclose the conflict of interest and by acting in the face of the conflict of interest, and in their other ethical and professional improprieties alleged here:  (1) misrepresented the source of their services in violation of Cal. Civ. Code § 1770(2); and (2) misrepresented the affiliation, connection, or association with the entity giving rise to the conflict of interest, in violation of Cal. Civ. Code § 1770(3).

75.     As a direct and proximate result of defendants' violation of the California Consumers Legal Remedies Act, plaintiffs and the proposed class members have been injured as described here.  Defendants have acted in bad faith, and have shown willful misconduct, malice, fraud, wantonness, or oppression or that entire want of care which would raise the presumption of conscious indifference to consequences.  As a direct and proximate result of defendants' actions and omissions alleged here, plaintiffs and the proposed class members have

SECOND AMENDED COMPLAINT FOR DAMAGES

been injured, and are entitled to injunctive relief.

## SIXTH CAUSE OF ACTION FOR FRAUD

### (Against All Defendants)

76.    Plaintiffs reallege the allegations contained in all preceding paragraphs.

77.    Defendants' statements and omitted statements alleged here to plaintiff and the proposed class members regarding the conflict of interest, and the statements and omitted statements by defendants and their cappers and runners to plaintiff and the proposed class members regarding the settlement of the case and the value both of the proposed settlement and of defendants' services in relation to the value of the services of other attorneys, contained knowingly false representations.  These statements and omitted statements were made with intent to deceive, defraud, or to induce reliance.

Plaintiffs and the proposed class members justifiably relied upon the fraudulent statements and omitted statements of defendants and their agents.  As a direct and proximate result, plaintiffs and the proposed class members have been damaged, and are entitled to recover damages, including punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE** Plaintiffs respectfully request this Court to:

a.    Certify this case as a class action;

b.    Award plaintiffs and the proposed class members, and require defendants to pay, as damages or restitution, the balance of plaintiffs' and class members' lost escrow deposits not paid in settlement in the Cosmopolitan litigation, with interest; and award plaintiff Estakhrian and those proposed class members not provided a full refund of their legal retainer deposit, the unreimbursed balance of that deposit, with interest;

SECOND AMENDED COMPLAINT FOR DAMAGES

c.      Award punitive damages where appropriate;

d.      Require defendants to disgorge the fees they unlawfully retain;

e.      Award plaintiffs and the proposed class members their reasonable attorneys' fees and costs of the action; and

f.      Order such other and further relief as the Court deems just and proper.

Dated:  October 27, 2015                 Respectfully submitted,

IRVINE LAW GROUP, LLP
MEHRI & SKALET PLLC
FAY LAW GROUP PLLC
CHAVEZ & GERTLER LLP


By:___/S/_____

Ron Alikani, Esq.
*Attorneys for Plaintiffs and the Proposed Class*

## JURY TRIAL DEMAND

Plaintiffs hereby demand a jury trial on all issues so triable.

Dated:  October 26, 2015                 Respectfully submitted,

IRVINE LAW GROUP, LLP
MEHRI & SKALET PLLC
FAY LAW GROUP PLLC
CHAVEZ & GERTLER LLP


By:____/S/_____

S. Ron Alikani, Esq.
*Attorneys for Plaintiffs and the Proposed Class*

SECOND AMENDED COMPLAINT FOR DAMAGES

MEHRI & SKALET PLLC
Steven A. Skalet, Esq. (*Admitted Pro Hac Vice*)
sskalet@findjustice.com
1250 Connecticut Avenue, NW Suite 300
Washington, DC 20036
Telephone:   (202) 822-5100
Facsimile:    (202) 822-4997

FAY LAW GROUP PLLC
Raymond C. Fay (*Admitted Pro Hac Vice*)
rfay@faylawdc.com
1250 Connecticut Ave, NW Suite 200
Washington, DC 20036
Telephone:   (202) 263-4604
Facsimile:    (202) 261-3508

CHAVEZ & GERTLER LLP
Mark A. Chavez (SBN 090858)
mark@chavezgertler.com
Dan Gildor (SBN 223027)
dan@chavezgertler.com
Nance F. Becker (SBN 099292)
nance@chavezgertler.com
42 Miller Avenue
Mill Valley, California 94941
Telephone:   (415) 381-5599
Facsimile:    (415) 381-5572

SECOND AMENDED COMPLAINT FOR DAMAGES

# EXHIBIT A

PAID = $1,000.00

**Mark R. Obenstine & Associates**

4533 MacArthur Boulevard
Suite 108
Newport Beach, California 92660
Office: (877) 734-8206
Direct Dial: (310) 503-5806
Direct Facsimile: (310) 362-0490

March 2, 2008

Dear Unit Purchaser of the Cosmopolitan Resort Casino:

We are pleased that you have decided to retain Mark R. Obenstine & Associates (hereinafter "Firm") as your legal counsel. This engagement letter will describe the basis on which the Firm will provide legal services to you. Accordingly, we submit for your approval and acceptance the following terms and conditions that will govern our engagement. If you are in agreement, please sign this engagement letter and return the original to us. If you have any questions about these provisions, or if you would like to discuss possible modifications, do not hesitate to call. We are pleased to have the opportunity to represent your legal interests.

1. **Client and Scope of Representation.** Our client in connection with the claim described herein is _James & Marjam Estakhrian_ 3679 _ [print name and condominium unit number] (hereinafter "Client"). We will be engaged to advise Client solely in connection with a claim for damages and/or rescission of a certain Purchase and Sale Agreement (hereinafter "Contract") that was executed by Client and 3700 Associates, LLC (hereinafter "Cosmopolitan"). It is important to note that the rights and obligations associated with the Contract were assigned to Nevada Property 1, LLC during prior foreclosure proceedings.

At this time, we contemplate filing one mass arbitration claim in which a large group of similarly-situated purchasers of units in the Cosmopolitan are joined together. Your Contract requires that all disputes be resolved by arbitration, and we prefer to proceed with an arbitration claim because it is likely to prove more expeditious and less expensive than a lawsuit. However, we will continue to consider and evaluate all legal alternatives, appreciative that the discovery of new information or changed circumstances may make the filing of a lawsuit in state or federal court the more beneficial course of action.

In the event we are successful in rescinding the Contract, Client will be entitled to recover his or her escrow deposit for the Cosmopolitan. We also intend to seek recovery of the interest that would have been earned on the Client's deposit since its placement into escrow.

Pursuant to the Contract, the prevailing party is entitled to reimbursement of all attorneys' fees and costs. This contractual provision means the Cosmopolitan will be compelled to reimburse you for all the attorneys' fees and costs incurred in connection with this matter in the event we are the prevailing party when an arbitration decision is rendered. Stated otherwise, you would be entitled to have your recovery increased by the amount of your attorneys' fees and costs in the event we obtain a favorable arbitration decision. Such reimbursement would not be contractually authorized if this matter is settled informally (i.e., resolution is not obtained as a result of a formal arbitration decision and award). We will work aggressively to ensure appropriate enforcement of this contractual provision by seeking reimbursement of all attorneys' fees and costs incurred in connection with this matter.

This contractual provision also means that you will be required to reimburse the Cosmopolitan for its attorneys' fees and costs in the event we are the losing party when an arbitration decision is rendered. The possibility of an unfavorable arbitration decision and its attendant economic impact has not escaped our attention. We are appreciative that our clients require the greatest degree of economic protection and predictability during these emotionally enervating economic times.

The best method by which to minimize the economic impact of any unanticipated unfavorable arbitration decision involves the formation of a large group of clients. There is great economic strength in great numbers as any reimbursable attorneys' fees and costs will be divided among and shared by a large group of clients. Such sharing will greatly increase the odds the economic impact for any one client will be relatively insignificant. As a result of our intention to file a mass arbitration claim and unmatched ability to manage a litigation matter involving hundreds of clients, we are uniquely positioned to provide this important measure of economic peace of mind.

We will prepare and file necessary documentation in connection with this litigation matter and pursue such matter aggressively to an ultimate conclusion, either by order of court or settlement. You may limit or expand the scope of our representation from time to time, provided that any substantial expansion of our scope of representation must be agreed to by us.

      2.    **Term of Engagement.** Either of us may terminate the engagement at any time for any reason by written notice, subject on our part to applicable rules of professional conduct. In the event we terminate the engagement, we will take such steps as are reasonably practicable to protect your interests in the above matter and immediately refund to you any unused portion of funds advanced to us pursuant to paragraph 5 of this engagement letter. If permission for withdrawal is required by a court, we will promptly apply for such permission, and you agree to engage successor counsel to represent you. The Client shall not terminate the services of the Firm with the intent to limit the Firm's fee due to a perceived or actual pending settlement. If the Firm is terminated and a judgment or settlement is thereafter reached within 90 days, the Firm shall be entitled to payment in the amount of a Contingency Fee pursuant to paragraph 3 and costs pursuant to paragraph 4.

Unless previously terminated, our representation of the Client will terminate upon our sending you our final statement for services rendered in this matter. Following such termination, otherwise nonpublic information you have supplied to us which is retained by us will be kept confidential in accordance with applicable rules of professional conduct. At your request, your papers and property will be returned to you promptly upon receipt of payment for outstanding fees and costs. Our own files, including lawyer work product, pertaining to the matter will be retained by the Firm. All such documents retained by the Firm will be transferred to the person responsible for administering our records retention program. For various reasons, including the minimization of unnecessary storage expenses, we reserve the right to destroy or otherwise dispose of any such documents or other materials retained by us within a reasonable time after the termination of the engagement.

You are engaging the Firm to provide legal services in connection with a specific matter. After completion of the matter, changes may occur in the applicable laws or regulations that could have an impact upon your future rights and liabilities. Unless you actually engage us after the closing to provide additional advice on issues arising from the matter, the Firm has no continuing obligation to advise you with respect to future legal developments.

      3.    **Contingency Fee.** In consideration for the services rendered and/or to be rendered by the Firm in the prosecution of the Client's claims, the Client will set over and assign to the Firm a contingency fee in accordance with the following:

a.  A 12.6% (reduced from 15.0%) interest in any net recovery received as a result of a final resolution or settlement if the case is resolved within 60 days after the filing of a Complaint or Demand for Arbitration;

b.  A 16.8% (reduced from 20.0%)interest in any net recovery received as a result of a final resolution or settlement if the case is resolved between the 61st and the 90th day after the filing of a Complaint or Demand for Arbitration; or

c.  A 28.0% (reduced from 33.3%) interest in any net recovery received as a result of a final resolution or settlement if the case is resolved after 90 days after the filing of a Complaint or Demand for Arbitration.

Since the Firm is working pursuant to a contingency fee arrangement, the Firm will not be entitled to recover any attorneys' fees from the Client in the event there is no recovery in regard to any of the causes of action. **Client acknowledges that the attorneys' fees set forth herein are not set by law but are negotiable between the Client and the Firm.** Client further acknowledges that the attorneys' fees set forth herein have been negotiated upon and are agreeable to both Firm and Client.

Client further acknowledges that the attorneys' fees set forth herein are solely in connection with the issues arising out of the matter described in paragraph 1 of this engagement letter. If the Firm is engaged to represent you in connection with related matters not covered by this engagement letter, the Client and the Firm will need to negotiate and execute a separate fee agreement with respect to the compensation arrangement that will govern said matters.

Attorneys working pursuant to a contingency arrangement are typically compensated on the gross recovery, meaning attorneys' fees are first deducted from the gross recovery and costs are paid or reimbursed from the net recovery. The Firm has decided to make a good faith concession for the economic benefit of the Client by deviating from the typical arrangement. In accordance with this concession, all outstanding costs will be paid and all costs advanced by the Client and the Firm shall be refunded from any recovery *before* the Firm's attorneys' fees are computed and paid. The attorneys' fees payable to the Firm shall then be deducted from the net recovery prior to distribution of the remaining recovery to the Client. The Client is ultimately responsible for payment of all necessary costs, whether advanced by the Firm or expended by the Client. Even if the Firm does not obtain a recovery, Client shall remain responsible for payment of all necessary costs.

4.  **Costs Incurred in Connection with Representation.** The costs for which the Client is responsible include, but are not necessarily limited to, travel expenses, copy costs, deposition and court transcript costs, court reporter and videographer charges, courier costs, long distance telephone charges, costs for computerized legal research (Lexis, Westlaw, etc.), overnight shipping and postage, and the fees and expenses of consultants and experts. The Firm will provide to the Client a fully itemized list of costs at the resolution of the matter.

As a result of our intention to file a mass arbitration claim, the costs associated with this matter will be divided among and shared by a large group of clients. This cost-sharing scenario will prove economically advantageous to everyone in the group in that it will greatly increase the odds that the costs for any one client will be relatively insignificant.

5.  **Retainer Check for Costs.** Client shall submit a retainer check for $1,000.00 as an advance for the costs that will be incurred in connection with our representation. In the event Client has purchased multiple condominium units and is seeking to rescind multiple contracts, Client shall submit a separate retainer check for $1,000.00 for each separate contract.

This retainer check shall be made out to *Mark R. Obenstine, Esq.* and submitted upon execution of this engagement letter to one of the following addresses:

Crestridge Partners                          Sunbelt Group, LLC
Attn: Mark R. Obenstine, Esq.                8635 W. Sahara Avenue
4533 MacArthur Boulevard          -OR-      Suite 596
Suite 108                                    Las Vegas, Nevada 89117
Newport Beach, California 92660

We are appreciative that current economic realities are proving problematic for many clients. Feel free to contact us if you wish to discuss payment of this advance via an installment plan. Such advance will be deposited in a trust account and will be used to pay the costs incurred in connection with our representation. Any unused portion of the advance will be refundable at the conclusion of our services. We will have the right to request additional advances from time to time based on our estimates of future work to be undertaken. If you fail to pay promptly any additional advance requested, we will have the right to withdraw from further representation.

     6.    **Settlement.** The Firm shall keep the Client advised of all material developments during the prosecution of this matter. As discussed, we contemplate filing one mass arbitration claim in which a large group of similarly situated purchasers of units in the Cosmopolitan are joined together. The formation of this large group of clients will not impact, disrupt or amend Client's absolute right to accept or decline a particular settlement offer. Client will not be expected or required to accept a settlement offer even if other members of the group decide to accept said offer. Indeed, the Firm fully understands and acknowledges that the decision whether to accept or decline a particular settlement offer is an individual decision that must be necessarily left to the informed judgment of each individual client. Accordingly, no settlement or final resolution of the Client's claims shall be made without the full knowledge and approval of the Client.

     7.    **Client Responsibilities.** Do not underestimate the importance of your role during the prosecution of this claim. You agree to cooperate fully with us and provide promptly all information known or available to you relevant to our representation. You also agree to pay any additional retainer for costs in accordance with paragraphs 4 and 5 of this engagement letter.

     8.    **Conflicts.** Client understands and acknowledges that the Firm represents many other companies and individuals. It is possible that during the time that we are representing the Client, some of our present or future clients will have disputes or transactions with the Client. The Client agrees that we may continue to represent or may undertake in the future to represent existing or new clients in any matter that is not substantially related to our work for you even if the interests of such clients in those other matters are directly adverse to you. However, we agree that your prospective consent to conflicting representations contained in the preceding sentence shall not apply in any instance where, as a result of our representation of you, we have obtained proprietary or other confidential information of a nonpublic nature, which, if known to such other client, could be used in any such other matter by such client to your material disadvantage.

     9.    **Lien.** The Client assigns and grants the Firm a lien on all proceeds payable to the Client in settlement, judgment, award or verdict to secure the payment of Attorneys' Fees and costs delineated in this engagement letter. The Client authorizes the Firm to receive all proceeds recoverable for such a settlement, judgment, award or verdict and agrees that the Firm may deduct from such recovery the full amount of Attorneys' Fees and costs delineated in this engagement letter.

**10.**     **Fee-Sharing Agreement.** The Client acknowledges that the Firm will divide and share the Attorneys' Fees set forth in paragraph 3 with other attorneys and legal consultants. The Client further acknowledges that the Firm will receive 66.67% and Marquis & Aurbach will receive 33.33% of the Attorneys' Fees set forth in paragraph 3. This fee-sharing agreement will not increase, amend or impact in any manner the amount of the Attorneys' Fees set forth in paragraph 3. The Client fully and expressly consents to this fee-sharing agreement.

**11.**     **Confidentiality.** Client and Firm hereby agree that all of the provisions of this engagement letter (hereinafter "Confidential Information") shall be held in the strictest confidence. Client hereby represents, warrants and agrees that he has not nor ever shall disclose or publicize, or cause to be disclosed or publicized any Confidential Information to any person or entity in any manner except only (1) as is necessary to carry out the provisions of this engagement letter, or (2) to a party's legal or financial advisor, and then only for the limited purpose of obtaining professional advice and not for further dissemination (except as may be required by law). Client further agrees to instruct any person or entity who obtains knowledge of any Confidential Information that he, she, or it is required to hold such knowledge in the strictest confidence and shall not disclose any Confidential Information to any person or entity except as expressly is permitted by this Paragraph.

We look forward to working for and with you to achieve a successful resolution of your claim. Feel free to call me if you have any questions or comments during the course of our representation.

Very truly yours,

Mark R. Obenstine, Esq.

AGREED TO AND ACCEPTED:

CLIENT: _____ [Signature]     Date: _3/3/09_

Print Name: _JAMES ESTAKHRIAN_     Condominium Unit Number: _1785 &_
_3679_

_26601 Bridlewood Dr._
Street Address

_Laguna Hills    CA    92653_
City            State        Zip Code

_estakte@hotmail.com_     Telephone: _714-906-6982_
Email Address

ATTORNEY: By: _____     Date: _04/07/09_
                Mark R. Obenstine, Esq.

PLEASE SEND A SIGNED ENGAGEMENT LETTER, RETAINER CHECK AND A COPY OF YOUR PURCHASE AND SALE AGREEMENT TO ONE OF THE ADDRESSES LISTED IN PARAGRAPH 5.