FILED
CLERK, U.S. DISTRICT COURT
6/20/2017
CENTRAL DISTRICT OF CALIFORNIA
BY: ___CW___ DEPUTY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES ESTAKHRIAN and ABDI NAZIRI, on behalf of themselves and all others similarly situated,<br><br>                Plaintiffs,<br><br>    v.<br><br>MARK OBENSTINE, et al.<br><br>                Defendants. | Case No. CV 11-3480 FMO (CWx)<br><br>**PRELIMINARY INJUNCTION RE: COMMUNICATIONS WITH CLASS MEMBERS** |

Having reviewed and considered all the briefing filed with respect to Plaintiffs' Ex Parte Application for Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should not Issue (Dkt. 523, "Application"), and the evidentiary hearing held on June 15, 2017,[1] the court concludes as follows.

## BACKGROUND

The instant matter arises out of a class action that was litigated in Nevada state court, Daniel Watt, et al. v. Nevada Property 1, LLC, et al., Case No. A582541 ("Nevada litigation"). (See Dkt. 373, Second Amended Class Action Complaint ("SAC") at ¶ 20). On February 11, 2009,

---

[1] At the conclusion of the June 15, 2017, evidentiary hearing, the court granted plaintiffs' application for a temporary restraining order.

plaintiffs filed a class action complaint for breach of contract regarding the purchase of condominium units in what became the Cosmopolitan Hotel, located in Las Vegas, Nevada. (See id.). The Nevada litigation eventually settled in 2010. (See id. at ¶ 32).

On April 22, 2011, plaintiff James Estakhrian ("Estakhrian"), on behalf of himself and all others similarly situated, filed this action against various law firms and attorneys, including defendant Mark Obenstine ("Obenstine"), the sole remaining defendant in this action. (See Dkt. 1, Complaint at ¶¶ 17-20). On October 27, 2015, the operative complaint was filed, adding Abdi Naziri ("Naziri") as a named plaintiff (collectively, Estakhrian and Naziri are referred to as "plaintiffs"). (See Dkt. 373, SAC). Plaintiffs assert causes of action for professional malpractice, breach of fiduciary duty, fraud, violations of California Business & Professions Code §§ 17200, et seq., violations of the California Consumers Legal Remedies Act, California Civil Code §§ 1750, et seq., and breach of contract. (See id. at ¶¶ 51-77).

On February 4, 2017, the court granted plaintiffs' motion for class certification. (See Dkt. 500, Court's Order of February 4, 2017, at 32-33). On February 21, 2017, Obenstine, proceeding pro se, filed a petition for permission to appeal the court's class certification order pursuant to Rule 23(f) of the Federal Rules of Civil Procedure. (See Estakhrian v. Obenstine, No. CV 17-80026 (9th Cir.), Dkt. 1, Petition for Permission to Appeal). On May 17, 2017, the Ninth Circuit denied Obenstine's petition. (See id., Dkt. 8, Court's Order of May 17, 2017, at 1). On May 26, 2017, "[i]n light of the Ninth Circuit Court of Appeal's Order denying defendant Mark Obenstine's amended petition for permission to appeal the court's order granting class certification, and in an effort to get this matter to trial," (Dkt. 519, Court's Order of May 26, 2017, at 1), the court set this matter for trial on June 22, 2017. (See id. at 6). The court later vacated the trial date pending notice to the class pursuant to Rule 23(c)(2) of the Federal Rules of Civil Procedure. (See Dkt. 522, Court's Order of June 6, 2017, at 1).

Although two classes had been certified on February 4, 2017, and the Ninth Circuit refused to grant Obenstine leave to challenge the court's certification order on May 17, 2017, Obenstine,

on May 31, 2017, sent an email to 700[2] class members offering to settle the action for $1,000 to the first 263 class members that responded to the email and requested a settlement agreement.[3] (See Dkt. 523-2, Declaration of Nance F. Becker [] ("Becker Decl.") at Exh. A). The subject line of Obenstine's email states, "Settlement Offer for $1,000 for Purchasers of Units at the Cosmopolitan Resort Casino," (id. at ECF 13160), and provides that it constitutes a "confidential settlement communication" pursuant to Rule 408 of the Federal Rules of Evidence. (Id. at ECF 13160 & 13164). The email states that Obenstine is "willing to offer $1,000.00 per Cosmopolitan unit to the first 263 purchasers who sign [his] settlement agreement," (id. at ECF 13160), and stresses that the settlement offer is "only available to the first 263 purchasers who accept [his] offer," because Obenstine "is not in a position to offer [] more money," and in fact, "the money being offered to [class members] is money [he] borrowed from family and friends." (Id. at ECF 13161). Obenstine explains that, "in his professional opinion," he "only need[s] 263 purchasers to accept [his] settlement offer to end this lawsuit." (Id. at ECF 13162).

Obenstine's email asserts that plaintiffs, in their "desperat[ion] to move forward with [their] lawsuit," raised a "last-minute new theory" that "is subject to automatic exclusion," and is "legally frivolous and destined to fail." (Dkt. 523-2, Becker Decl., Exh. A at ECF 13161). Obenstine contends that, "in his professional opinion," (id. at ECF 13162), "purchasers who are not residents of California will not be able to recover any money from [him] even if [he] lose[s] since [plaintiffs'] damages theory is predicated on a California statute that can not be applied extra-territorially." (Id.).

According to Obenstine, he wants to "do everything possible to end this lawsuit and thus

---

[2] Obenstine testified that approximately 60 to 65 percent of the 700 emails he sent bounced back as undeliverable and, as a result, approximately 289 class members actually received Obenstine's May 31, 2017, email. (See Dkt. 525, Mark Obenstine's Opposition to Plaintiffs' [Application] ("Opp.") at 9, 13).

[3] Obenstine testified that in March 2017, he sent an email to approximately 40 class members, offering to settle with each class member for $550. According to Obenstine, he received only one response to his email indicating interest in settling.

3

the pain it has caused [Obenstine] and [his] family both emotionally and financially[.]"[4] (Id. at ECF 13161). Obenstine claims that he has "spent millions of dollars in defense of the fees [he] earned," which has "forced [him] to prepare to liquidate assets and [his] retirement account to pay [his] monthly bills[,]" (id. at ECF 13162), and that he is "prepared to spend every last dollar in [his] possession to defend against this lawsuit due to [his] unwillingness to ever give [plaintiffs] and his attorneys a single dollar." (Id.).

Finally, Obenstine asserts that on June 30, 2017, he "will file a lawsuit against Mr. Estakhrian and his attorneys to recover the money [he] was forced to spend to defend against his lawsuit." (Dkt. 523-2, Becker Decl., Exh. A at ECF 13162). According to Obenstine, "[o]nce [he] file[s] this lawsuit, [he] do[es] not believe the attorneys representing [Estakhrian] will be allowed to continue representing him and thus he will be forced to find new counsel or dismiss this lawsuit." (Id. at ECF 13163). "Given the frivolousness of [the] lawsuit, [Obenstine] do[es] not think any reputable attorney will agree to represent [Estakhrian] once [Obenstine] remove[s] [Estakhrian's] attorneys for attempted extortion." (Id.). Obenstine concludes the email by telling class members that "[i]f [they] would like to review a formal copy of [his] settlement agreement," (Dkt. 523-2, Becker Decl., Exh. A at ECF 13163), they should respond to his email and type "[s]end me a formal agreement to review." (Id.).

During the evidentiary hearing, Obenstine testified that approximately 60 to 65 class members requested a copy of the settlement agreement. Obenstine sent responsive emails confirming receipt and further responded that he would send the settlement agreement within a week or two. Obenstine also testified that he hired an assistant[5] who called approximately 40 class members to gauge their interest in separately settling their case with Obenstine. According to Obenstine, of the 40 class members contacted by telephone, one class member requested a

---

[4] Obenstine's email is replete with claims that the case will "continue to destroy [his] life for another 2 years," (Dkt. 523-2, Becker Decl., Exh. A at ECF 13162), and is an "emotional and financial nightmare." (Id.).

[5] Although Obenstine hired the assistant to work "approximately one-and-a-half weeks ago" in June 2017, Obenstine "forgot her full name," but identified the assistant as "Tracy" who is located in San Francisco, California.

4

copy of the settlement agreement. Although Obenstine has drafted the settlement agreement, he had not, as of the date of the evidentiary hearing, sent a copy of that agreement to any class member. Finally, Obenstine testified that he has not entered into any individual settlement agreement with any class member since the filing of the lawsuit.

Plaintiffs first learned of Obenstine's email on June 5, 2017, from a class member. (See Dkt. 523-2, Becker Decl. at ¶ 2). That class member was "very reluctant to forward" the email to class counsel "because Obenstine had titled it a 'Confidential Settlement Communication,'" (id. at ¶ 3), and because Obenstine stated that he "'will' file a lawsuit against Mr. Estakhrian and his attorneys." (Id.). "The class member concluded that if [the class member] forwarded the email, Obenstine might sue [the class member] as well." (Id.).

## **LEGAL STANDARD**

Rule 65 provides courts with the authority to issue temporary restraining orders and preliminary injunctions. Fed. R. Civ. P. 65(a) & (b). The purpose of a preliminary injunction is to preserve the status quo and the rights of the parties until a final judgment on the merits can be rendered, see U.S. Philips Corp. v. KBC Bank N.V., 590 F.3d 1091, 1094 (9th Cir. 2010), while the purpose of a temporary restraining order is to preserve the status quo before a preliminary injunction hearing may be held. See Wahoo Int'l., Inc. v. Phix Doctor, Inc., 2014 WL 2106482, *2 (S.D. Cal. 2014). The standards for a temporary restraining order and a preliminary injunction are the same. See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., 240 F.3d 832, 839 n. 7 (9th Cir. 2001); Rowe v. Naiman, 2014 WL 1686521, *2 (C.D. Cal. 2014) ("The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction.").

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24, 129 S.Ct. 365, 376 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Id. at 20, 129 S.Ct. at 374; Garcia v. Google, Inc., 786 F.3d 733, 740 (9th Cir. 2015) (en banc) (same). The Ninth Circuit also employs a "sliding scale" formulation of the preliminary injunction test under which an injunction could be issued

where, for instance, "the likelihood of success is such that serious questions going to the merits [are] raised and the balance of hardships tips sharply in plaintiff's favor[,]" Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011) (internal quotation marks and brackets omitted), provided the other elements of the Winter test are met. See Angelotti Chiropractic, Inc. v. Baker, 791 F.3d 1075, 1081 (9th Cir. 2015) ("Serious questions going to the merits and hardship balance that tips sharply towards plaintiffs can also support issuance of a preliminary injunction, so long as there is a likelihood of irreparable injury and the injunction is in the public interest.") (internal quotation marks and brackets omitted).

A preliminary injunction "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972, 117 S.Ct. 1865, 1867 (1997) (emphasis in original; citation omitted); Silvas v. G.E. Money Bank, 449 F.App'x 641, 644 (9th Cir. 2011) (same). Indeed, the moving party bears the burden of meeting all prongs of the Winter test. See Cottrell, 632 F.3d at 1135; DISH Network Corp. v. FCC, 653 F.3d 771, 776 (9th Cir. 2011), cert. denied 132 S.Ct. 1162 (2012) ("To warrant a preliminary injunction, [plaintiff] must demonstrate that it meets all four of the elements of the preliminary injunction test established in Winter[.]"). The decision of whether to grant or deny a preliminary injunction is a matter of the district court's equitable discretion. See Winter, 555 U.S. at 32, 129 S.Ct. at 381.

**DISCUSSION**

"After a court has certified a class, communication with class members regarding the subject of representation must be through counsel for the class." Jacobs v. CSAA Inter-Ins., 2009 WL 1201996, *2 (N.D. Cal. 2009); see Parks v. Eastwood Ins. Servs., Inc., 235 F.Supp.2d 1082, 1083 (C.D. Cal. 2002) ("In a class action certified under Rule 23, Federal Rules of Civil Procedure, absent class members are considered represented by class counsel unless they choose to 'opt out.' Defendants' attorneys are subject to the 'anti-contact' rule, and must 'refrain from discussing the litigation with members of the class as of the date of class certification.'") (citations omitted).

Obenstine asserts that he was not prohibited from contacting the class members because he was contacting them in his capacity as a party, not as an attorney. (See Dkt. 525, Opp. at 10-11). According to Obenstine, in January 2017, "[a] California State Bar representative informed

[him] that [he] was not prohibited from contacting putative members of the class because [he] was being represented by counsel and thus not subject to the strictures of Rule 2-100."[6] (Dkt. 525-1, Declaration of Mark Obenstine ("Obenstine Decl.") at ¶ 2). During the evidentiary hearing, Obenstine testified that he spoke with the State Bar representative for 15 minutes, and that the representative was eager to hear the facts of the litigation and was well-versed with Rule 2-100.[7] According to Obenstine, this unnamed State Bar representative told him that he could reach out to the class members because he is represented by counsel, and that Obenstine's email could be persuasive rather than drafted from a neutral point of view.

Given Obenstine's asserted concern about complying with his ethical obligations as they relate to communicating with parties who are represented by counsel, the court finds it incredible that Obenstine did not bother to take down the name and phone number of the California State Bar representative who allegedly provided him with advice regarding Rule 2-100. Obenstine's testimony regarding the State Bar's representative's statements lacks credibility, not only because Obenstine cannot give the name of the representative who could corroborate the advice the representative provided, but also because of the self-serving, unverifiable nature of Obenstine's recollection of his conversation with the California State Bar representative.[8] And, as discussed below, the misleading statements in Obenstine's email further under Obenstine's credibility.

In any event, putting aside the fact that Obenstine has little, if any, credibility, the fact remains that this is not the typical situation where a party, knowing that the opposing party is

---

[6] Rule 2-100(A) of the California Rules of Professional Conduct provides: "While representing a client, a member shall not communicate directly or indirectly about the subject of the representation with a party the member knows to be represented by another lawyer in the matter, unless the member has the consent of the other lawyer."

[7] Obenstine testified that he called the California State Bar again on June 9, 2017, and spoke with a representative for approximately two minutes while driving in his car. According to Obenstine, this second unnamed representative confirmed the opinion of the prior unnamed State Bar representative.

[8] The court also notes that Obenstine testified that he did not seek the advice of his counsel representing him in this action, Harry Safarian, regarding the appropriateness of his communications with his former clients.

represented by counsel, reaches out and communicates with that opposing party. Obenstine previously represented the class members in this case in the Nevada litigation and thus communicated with them in his capacity as their former attorney.[9] (See Dkt. 500, Court's Order of February 4, 2017, at 5) (quoting Obenstine's declaration which states that "[i]n early 2009, [Obenstine], along with Terry Coffing and his firm, Marquis & Aurbach, represented James Estakhrian and other purchasers of Cosmopolitan Resort Casino . . . condominiums in [the Nevada litigation]."). Obenstine directly reached out to approximately 700 certified class members – all of whom were his former clients – without contacting class counsel, and discussed the merits of plaintiffs' claims and urged them to enter into separate settlement agreements with him. (See Dkt. 523-2, Becker Decl., Exh. A). Obenstine's email to the class members does not include the lay opinions of a party, but rather, Obenstine's "professional opinion" as an attorney.[10] (See id. at ECF 13162). In other words, Obenstine contacted the class members in his capacity as their former counsel, and thus was bound by the prohibition against communicating with parties who are represented by counsel, see Cal. RPC 2-100, and also by the duty of loyalty to former clients. See Jun Ki Kim v. True Church Members of Holy Hill Cmty. Church, 236 Cal.App.4th 1435, 1456 (2015) ("The ethical bar against acting in a manner adverse to a former client's interests implicates not just the duty to maintain client confidences, but [also] the duty of loyalty[.]"); Cal. RPC 3-310(b)(4). What Obenstine refuses to acknowledge is that, in large part, the instant action is an attorney malpractice action against him for his conduct in the Nevada litigation. (See Dkt. 373, SAC at ¶¶ 51- 60) (asserting claims of professional malpractice and breach of fiduciary duty). Under Obenstine's interpretation, any attorney sued for malpractice – i.e., the defendant in the malpractice action – is free to contact his or her former clients without the knowledge or

---

[9] At the evidentiary hearing, Obenstine at times equivocated whether he represented the class members in the Nevada litigation, but finally admitted that he received $12 million in attorney's fees from his representation of the entire class in the Nevada litigation and owed fiduciary duties to his former clients.

[10] Obenstine admitted at the evidentiary hearing that his opinions in the email, including, among others, that the instant litigation is "frivolous," were based on Obenstine's understanding of the law, i.e., in his capacity as an attorney.

8

permission of the current attorney representing the former client. Obenstine has not put forward any authority to support that interpretation. (See, generally, Dkt. 525, Opp.).

Moreover, even if Obenstine was not acting as an attorney communicating with his former clients, and even if a class had not yet been certified, the court is empowered to enjoin a party's, i.e., Obenstine's, communications with class members, both before and after a class has been certified. "Federal Rule of Civil Procedure 23(d) gives district courts discretionary authority, within the bounds of Rule 23, to exercise control over a class action." Wang v. Chinese Daily News, Inc., 623 F.3d 743, 755 (9th Cir. 2010), cert. granted, judgment vacated on other grounds, 565 U.S. 801 (2011). "In general, district courts have both a duty and broad authority to control communications to putative class members even before class certification and to enter appropriate orders governing the conduct of counsel and the parties." O'Connor v. Uber Techs., Inc., 2013 WL 6407583, *4 (N.D. Cal. 2013). "[A]n order limiting communications between parties and potential class members should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties. . . . In addition, such a weighing – identifying the potential abuses being addressed – should result in a carefully drawn order that limits speech as little as possible, consistent with the rights of the parties under the circumstances." Camp v. Alexander, 300 F.R.D. 617, 621 (N.D. Cal. 2014) (citing Gulf Oil Co. v. Bernard, 452 U.S. 89, 101-02, 101 S.Ct. 2193, 2201 (1981)) (internal quotation marks omitted). The requisite factual finding "does not require a finding of actual misconduct," but rather, "[t]he key is whether there is potential interference with the rights of the parties in a class action." O'Connor, 2013 WL 6407583 at *4-5. Courts have "imposed limitations on communications, and invalidated agreements obtained through those communications, based on findings that the communications were misleading, coercive, or omitted critical information." Retiree Support Grp. of Contra Costa Cnty. v. Contra Costa Cnty., 2016 WL 4080294, *6 (N.D. Cal. 2016) (citing cases).

Here, Obenstine's email clearly "interfere[s] with the rights of the parties in a class action." See O'Connor, 2013 WL 6407583 at *4-5. First, Obenstine's email is coercive and detrimental to class counsel's attorney-client relationship because the class members are Obenstine's former

9

clients.  See Tedesco v. Mishkin, 629 F.Supp. 1474, 1483 n. 12 (S.D.N.Y. 1986) ("The communication was particularly detrimental to plaintiffs' attorney-client relationship because many of the class members are former clients of Mishkin."). Obenstine's email undermines the integrity of class counsel and their attorney-client relationship with the class members by threatening to sue them and Estakhrian for "extortionate conduct," and by asserting that plaintiffs' claims are "frivolous," which "no reputable attorney" would agree to assert. (Dkt. 523-2, Becker Decl., Exh. A at ECF 13163). Obenstine's email also coerced class members to opt-out by telling them that Obenstine was nearing insolvency, (see id. at ECF 13162) (litigation "forced [Obenstine] to prepare to liquidate assets and [his] retirement account to pay [his] monthly bills"), and was prepared to distribute the full amount of his available funds to the first 263 class members who responded to his email. (See id.). In other words, Obenstine threatened class members that if they did not settle with him immediately, they would receive nothing at all. (See id.). Obenstine told the class members that he was "prepared to spend every last dollar in [his] possession to defend against this lawsuit due to [his] unwillingness to ever give [plaintiffs] and his attorneys a single dollar." (Id.).

Second, Obenstine threatened class members when he stated he would file a lawsuit against their attorneys and class representative Estakhrian.[11] (See Dkt. 523-2, Becker Decl., Exh. A at ECF 13162). If Obenstine was willing to sue Estakhrian, his former client, then Obenstine would obviously be wiling to sue any class member, even if the class member was Obenstine's former client. Obenstine's threat, no doubt, has caused class members to seriously consider whether to continue participating in this case. Indeed, the class member who received the email and called class counsel to alert them of the email was reluctant to come forward because of his fear that he might be sued by Obenstine. (See Dkt. 523-2, Becker Decl. at ¶ 2).

---

[11] Because Obenstine "stipulates that he will not file any action against Plaintiff James Estakhrian and Class Counsel until the Court has had an opportunity to evaluate Plaintiffs' demand for Court intervention with respect to that issue," (Dkt. 525, Opp. at 9; see id. at 10, 17 n. 6), the court will grant a preliminary injunction to the extent plaintiffs seek an order precluding Obenstine from filing a lawsuit against Estakhrian, Naziri, or class counsel without written permission from the court. (See Dkt. 523, Notice of Motion at 1).

Putting aside the inherently coercive and threatening nature of Obenstine's intention to sue class counsel and Estakhrian, Obenstine's email also omits critical information, making it misleading in many ways. For example, Obenstine's email failed to mention that he had already filed a lawsuit against Estakhrian and class counsel in connection with this lawsuit, which asserted claims for, among other things, civil conspiracy and intentional infliction of emotional distress, and was dismissed pursuant to a settlement on January 6, 2016.[12] (See Obenstine v. Jafary, et al., Case No. CV 13-1291 (C.D. Cal.), Dkt. 68, First Amended Complaint). Obenstine's email also misled the class members by neglecting to tell them that the court rejected Obenstine's assertions, (see Dkt. 498, Court's Order of January 29, 2017, at 11-12 n. 11), that plaintiffs raised a "new theory" that "is subject to automatic exclusion" and is "legally frivolous and destined to fail."[13] (Dkt. 523-2, Becker Decl., Exh. A at ECF 13161). The email also states that "purchasers who are not residents of California will not be able to recover any money from [Obenstine] even if [he] lose[s] since [plaintiffs'] damages theory is predicated on a California statute that can not be applied extra-territorially." (Dkt. 523-2, Becker Decl., Exh. A at ECF 13162). Again, Obenstine misled the class members by failing to tell them that the court addressed and rejected his argument relating to the application of the subject "California statute." (See Dkt. 500, Court's Order of February 4, 2017, at 23-24); see also Jonczyk v. First Nat'l Cap. Corp., 2014 WL 1689281, *4 (C.D. Cal. 2014) ("California [] has [a]n interest in applying the UCL to the activities of California businesses, regardless of whether injuries resulting from those activities are experienced by a California

---

[12] Arguably, any attempt by Obenstine to file another lawsuit against class counsel and Estakhrian could be barred by res judicata, claim preclusion, etc. (See Obenstine v. Jafary, et al., Case No. CV 13-1291 (C.D. Cal.), Dkt. 113, Court's Order of January 6, 2016) (dismissing action with prejudice pursuant to January 5, 2016, notice of settlement).

[13] This is not the first time Obenstine has raised this argument. (See, e.g., Dkt. 505, Mark Obenstine's Opposition to Plaintiff's Ex Parte Application for Temporary Restraining Order and Order to Show Cause [] at 3-4; Dkt. 517, Mark Obenstine's Response Challenging the Issuance of a Preliminary Injunction at 2-3). Obenstine has previously been advised to refrain from his "relentless repetition of [] arguments which have been previously rejected by the District Court," (see Dkt. 483, Special Master's Order of September 26, 2016, at 10), which "unreasonably and vexatiously" multiplies the proceedings and is sanctionable under 28 U.S.C. § 1927. (See id.) (citing Lamboy-Ortiz v. Ortiz-Velez, 630 F.3d 228, 246 (1st Cir. 2010)).

resident.").

In short, there is no doubt that Obenstine's email to his former clients interfered with the rights of the class members in this action. The email was coercive, threatening and misleading. Obenstine's email seriously undermined the attorney-client relationship between class counsel and their clients. Obenstine's unauthorized and inherently coercive email to his former clients – the class members in this case – frustrated the court's purposes in carrying out its fiduciary duties to the class members. Obenstine's email has created fear and confusion among the class members that, no doubt, has significantly increased the possibility that class members will opt out, thereby undermining the policies under Rule 23 class actions.

Based on the foregoing, the court finds that plaintiffs have demonstrated that they are likely – indeed, they already have – suffered irreparable harm in the absence of injunctive relief. Class members have a right not to be coerced or threatened in any manner by any party, let alone by their former attorney. Also, "[c]lass members have a due process right to not be misled while they are deciding whether to participate in a class settlement affecting their rights." Retiree Support Grp., 2016 WL 4080294 at *8 (finding such harm "irreparable").

Turning to the balance of hardships, "the hardships imposed on the parties in the absence of relief would be significant" since plaintiffs have demonstrated that class members' due process rights to make a decision regarding the class litigation have been irreparably harmed by Obenstine's coercive, threatening and misleading communications. See Retiree Support Grp., 2016 WL 4080294 at *9. In contrast, the harm to Obenstine is slight, since the preliminary injunction would require him and anyone associated with him to seek permission from the court prior to communicating with the class members and abide by the California Professional Rules of Conduct as an attorney attempting to communicate with his former clients.

Finally, the public interest favors the granting of a preliminary injunction because this order serves the court's duty "not only to protect class members in particular but to safeguard generally the administering of justice and the integrity of the class certification process." Retiree Support Grp., 2016 WL 4080294 at *10.

**CONCLUSION**

Based on the foregoing, IT IS ORDERED THAT:

1. Plaintiffs' Ex Parte Application for Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should not Issue (**Document No. 523**) is **granted**. A preliminary injunction shall issue as set forth below.

2. Defendant Mark Obenstine, along with his attorneys, officers, employees, agents, licensees, relatives, representatives, and all other persons or entities acting or purporting to act on his behalf are prohibited from communicating with any class member in the above-referenced action without prior authorization from the court. Mark Obenstine must notify and produce copies to class counsel and the court of all communications that he or any of his agents receive from any class member within 24 hours of any such communications.

3. No later than **June 27, 2017**, Mark Obenstine shall file a detailed declaration under penalty of perjury disclosing any and all communications with class members during the pendency of this action.

4. Mark Obenstine along with his attorneys, officers, employees, agents, licensees, relatives, representatives, and all other persons or entities acting or purporting to act on his behalf are prohibited from filing any lawsuit against James Estakhrian, Abdi Naziri and/or class counsel during the pendency of this action, including any appeals, without first seeking leave from the court.

5. Any settlement agreement entered into by Mark Obenstine with any member of the class in this action is hereby void and unenforceable. Any amounts paid to class members by Obenstine shall be deducted from any amount received by that class member as a result of a trial or settlement.

Dated this 20th day of June, 2017.

/s/
Fernando M. Olguin
United States District Judge