Harry A. Safarian (SBN 204106)
SAFARIAN & BAROIAN, LLP
1000 N. Central Avenue, Suite 210
Glendale, California 91202

Tel.: (818) 334-8528
Fax: (818) 334-8107

hs@safarianfirm.com

Attorneys for Defendant, MARK OBENSTINE

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES ESTAKHRIAN and ABDI NAZIRI, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>vs.<br><br>MARK OBENSTINE, BENJAMIN F. EASTERLIN IV, TERRY A COFFING, KING & SPALDING, LLP, and MARQUIS & AURBACH, P.C.,<br><br>        Defendants. | Case No.: CV11-3480 FMO<br><br>**OPPOSITION TO MOTION FOR SANCTIONS PURSUANT TO 28 U.S.C. § 1927 AND THE COURT'S INHERENT AUTHORITY; DECLARATION OF HARRY A. SAFARIAN**<br><br>JAMS REF# 1220052101<br><br>Special Master:<br>Hon. Roselyn Chapman (Ret.) |

TO THE HONORABLE ROSELYN CHAPMAN (RET.) AND PLAINTIFFS AND THEIR ATTORNEYS:

Opposition is hereby submitted to Plaintiffs' Motion for Sanctions Pursuant to 28 U.S.C. § 1927 and the Court's Inherent Authority as follows:

# **TABLE OF CONTENTS**

I.    Introduction……………………………………………………..............1

II.   Argument…………………………………………………………...4

   A. Plaintiffs' Motion for Sanctions Pursuant to Section 1927 is Without Merit, and the Motion Itself was Filed in Bad Faith…………………………4

   B. Sanctions Under the Court's Inherent Authority Should Be Denied Because the Court Did Not Authorize Such a Motion, and Because There Was no "Bad Faith Conduct" or "Willful Disobedience" of an Order……………………………………………………………………..5

III.  Plaintiffs Fail to Offer Any Evidence of Conduct Justifying Sanctions, Based on "Withholding of Evidence" and Present a Skewed, Incomplete, or Provably False Narrative In Support of a Meritless Motion………………………………………………………7

   A. The Court Already Ruled on the Issue of the Laptop and "Boxes of Documents" Obenstine Purportedly Failed to Disclose, Rendering a Further Sanctions Motion Duplicative, Harassing, and Improper……….7

   B. Plaintiffs' Repeated Allegations Obenstine Failed to Disclose Documents or a Laptop Are Manifestly False, as Court Transcripts Confirm These Materials Were Disclosed Three Years Ago……………...7

   C. Plaintiffs' Speculation Mr. Safarian "Failed to Identify or Produce Documents Used in Another Action" is False……………………………11

IV.   Plaintiffs Proffer No Evidence of Any "Fraud" Upon the Court by Obenstine, But There is Significant Evidence of Such Fraud by Plaintiffs and Their Counsel…………………………………….................13

   A. Plaintiffs' Assertion Mr. Safarian Falsely Represented that the Emails on Mr. Obenstine's Laptop Mirrored Those in the Crestridge Server are Knowingly False…………………………………13

i

V. Plaintiffs' Evidence of Alleged "Vexatious Multiplication of Proceedings and Dilatory Tactics" is Deliberately Incomplete or Inaccurate……………………………………………………………………16

   A. Plaintiffs' Contention Obenstine's Counsel Objected to Discovery in Bad Faith is Without Merit……………………………………………16

   B. The Motion to Dismiss for Lack of Personal Jurisdiction was Proper, as Was the Renewal of the Motion………………………………18

   C. Plaintiffs' Narrative Concerning the Motion to Quash/Protective Order Regarding the Stringfellow and Cracolice Depositions is Deliberately Incomplete and False…………………………………………20

   D. Obenstine Sought a Stay of Discovery Under the Anti-SLAPP Statute Because He Was Entitled to One by Statute, and the Case Was Financially Taxing……………………………………………………..22

   E. The Objection to Interrogatory No. 8, Which was Procedurally Defective and Overbroad, Was Not "Vexatious" or in "Bad Faith."…….23

   F. Plaintiffs Grossly Misconstrue Obenstine's Argument in Opposition to Plaintiffs' Motion for Leave to Amend…………………...24

   G. Obenstine's Argument Regarding Who Should Hear the Sanctions Motion Did Not "Delay Proceedings," and Does Not Justify Sanctions, and Was Not Vexatious…………………………………………25

ii

1

# **TABLE OF AUTHORITIES**

2

## **Federal Rules/Statutes**

3

FRCP, Rule 33(a)(1) ……………………………………………………17

4

Adv. Comm. Notes on 1993 Amendments to FRCP 33(a)(1) ………………….17

5

28 U.S.C. § 1927…………………………………………… 1, 4, 5, 8-11, 18, 22, 25

6

7

## **Case Authorities**

8

*Alyeska Pipeline Service Co. v. Wilderness Society*,

9
        421 US 240, 95 S.Ct. 1612 (1975) …………………………………....6

10

*B.K.B. v. Maui Police Dep't.*,

11
        276 F.3d 1091 (9th Cir. 2002) ………………………………………….4

12

*Blumberg v. Gates*,

13
        152 Fed. Appx. 652 (9th Cir. 2005) …………………………………...4, 25

14

*Chambers v. NASCO, Inc.*

15
        501 US 32, 111 S.Ct. 2123 (1991) …………………………………...6

16

*Collaboration Properties, Inc. v. Polycom, Inc.*

17
        224 F.R.D. 473 (ND CA 2004) …………………………………14, 17

18

*Fink v. Gomez*,

19
        239 F.3d 989 (9th Cir. 2001) ……………………………………….6

20

*Gomez v. Vernon*,

21
        255 F.3d 1118 (9th Cir. 2001) …………………………………………..4

22

*GRiD Systems Corp. v. John Fluke Mfg. Co., Inc.*,

23
        41 F.3d 1318 (9th Cir. 1994) …………………………………………...4

24

*Hadges v. Yonkers Racing Corp.*,

25
        48 F.3d 1320 (2d Cir. 1995) …………………………………….15, 19

26

27

28

*Hutchinson v. Pfeil*,
    208 F.3d 1180 (10th Cir. 2000) ……………………………………………6

*In re Keegan Management Co., Securities Litigation*,
    78 F.3d 431 (9th Cir. 1995) ………………………………………….4, 5

*Kendall v. GES Exposition Services, Inc.*,
    174 F.R.D. 684 (D NV 1997) …………………………………………17

*Lahiri v. Universal Music and Video Distribution Corp.*,
    606 F.3d 1216 (9th Cir. 2010)……………………………………………4

*Lee v. L.B. Sales, Inc.*,
    177 F.3d 714 (8th Cir. 1999)………………………………………..4, 25

*Pacific Harbor Capital, Inc. v. Carnival Air Lines, Inc.*
    210 F.3d 1112 (9th Cir. 2000) ……………………………………......4

*Primus Automotive Fin'l Services, Inc. v. Batarse*,
    115 F.3d 644 (9th Cir. 1997) ……………………………………......5

*Roadway Express, Inc. v. Piper*
    447 US 752, 100 S.Ct. 2455 (1980) ……………………………………6

*Salstrom v. Citicorp Credit Servs.*,
    74 F.3d 183 (9th Cir. 1996). ……………………………………......4

*Sentis Group, Inc. v. Shell Oil Co.*,
    559 F.3d 888 (8th Cir. 2009) ……………………………………......5

*Sherman v. Rinchem Co., Inc.*
    687 F.3d 996 (8th Cir. 2012) ……………………………………......6

*Trade Well Int'l v. United Central Bank*,
    778 F.3d 620 (7th Cir. 2015) ……………………………………......6

*Travelers Ins. Co. v. St. Jude Hosp. of Kenner La., Inc.*,
    38 F.3d 1414 (5th Cir. 1994) ………………………………………..4, 25

iv

*Wolters Kluwer Fin'l Services, Inc. v. Scivantage*
    564 F.3d 110 (2nd Cir. 2009) …………………………………….......6

OPPOSITION TO MOTION FOR SANCTIONS PURSUANT § 1927

# I.

## INTRODUCTION.

Plaintiffs' Motion, brought pursuant to 28 U.S.C. § 1927 and the Court's inherent authority,[1] is the latest in a series of meritless sanctions motions brought for sport. The evidence overwhelmingly confirms the Motion is based entirely on incomplete or incorrect factual narratives, and that, by filing the Motion, Plaintiffs' counsel have done precisely what section 1927 forbids: engaged in extensive "bad faith," "vexatious" litigation practices that needlessly multiply proceedings.

Plaintiffs take pains to impress upon the Special Master that the subject Motion was "invited" by the Court. Plaintiffs neglect to mention that the Court authorized the Motion in a Minute Order denying Plaintiffs' ex parte application for sanctions, which was then referred to the Special Master and denied. (Doc No. 468.) Indeed, the Special Master concluded Mr. Safarian made earnest efforts to meet and confer in preparation for trial when Plaintiffs' counsel "slammed the phone down" on Mr. Safarian. In spite of doing so, Plaintiffs' counsel ran to Court, falsely claiming Mr. Safarian behaved improperly. The instant Motion parallels the same pattern of meritless charges based on false factual narratives. The representations by Plaintiffs' counsel prompting the so-called "invitation" to file the subject Motion were **false**, and so are those supporting the Motion.

Plaintiffs' misrepresentations about Obenstine or his counsel are nothing new. A review of the Motion and the actual evidence confirms the Motion is an extension of an abusive and vexatious pattern of bad faith litigation tactics, and that the contentions in the Motion are disturbingly duplicitous or false. For instance:

1.    Plaintiffs' first Motion for Sanctions, and the Motion before the Special Master, both attest that Obenstine/his counsel *never disclosed* "boxes of documents" or a laptop with information relevant to the underlying lawsuit. But, Court

---

[1] The District Court authorized the filing of a Section 1927 motion only, and <u>did not</u> authorize a motion pursuant to the Court's inherent authority. See Doc. No. 468, ¶ 5.

1  transcripts from 2012 and 2013 confirm Mr. Safarian disclosed these materials on

2  the Court record (in addition to the dozen or so times these materials were discussed

3  with Plaintiffs' attorneys, including Karla Gilbride, who has never submitted a

4  declaration to the contrary), and Plaintiffs' counsel's representations to the contrary

5  in their first motion were a fraud upon the Court. Simply stated, Plaintiffs'

6  attorneys' representations Mr. Safarian *never* revealed the "boxes" or laptop were

7  **<u>false</u>**. Equally disturbing is that although the Special Master and Court already

8  issued sanctions with respect to those issues, Plaintiffs seek to re-litigate the same

9  issue here. Thus, Plaintiffs are clearly "vexatiously" multiplying proceedings in

10 "bad faith."

11      2.      Plaintiffs falsely claim Mr. Safarian "Filed and refiled **<u>four</u>** frivolous

12 motions to dismiss for lack of personal jursdictions [sic]." (Motion, 1:20-22

13 [Emphasis added].) A review of the Court docket confirms Obenstine filed only **<u>one</u>**

14 such Motion, and did so after his client signed a declaration providing substantial

15 evidence the Court lacked personal jurisdiction over Obenstine. Plaintiffs speculate

16 Mr. Obenstine chose to dismiss his jurisdictional challenge once "agreed to allow

17 Plaintiffs to take discovery on the issue." (Motion, 1:14-19.) This is manifestly

18 **<u>false</u>**. Judge Feess authorized jurisdictional discovery in his October 24, 2011 Order

19 (Doc. No. 46). The parties engaged in jurisdictional discovery for years. Mr.

20 Obenstine chose to withdraw the challenge after it became clear its purpose (to save

21 time and money litigating in a distant and inconvenient forum) was defeated by the

22 exhaustive costs of litigating the simple issue of jurisdiction. Safarian decl., ¶ 2.

23 Plaintiffs' speculation to the contrary is just that. There is not a hint of evidence Mr.

24 Safarian filed an improper motion to dismiss, and Plaintiffs' suggestion there were

25 **<u>four</u>** such Motions is false, and deserving of sanctions.

26      3.      Plaintiffs state, as fact, that Mr. Safarian "failed to identify or produce

27 documents he used in another action that was closely related to this case." (Motion,

28 2:10-13.) This statement is **<u>false</u>** and, not surprisingly, Plaintiffs' counsel fail to

1   identify *any* evidence supporting this attack. In reality, Obenstine provided his

2   counsel *verbal* information he received from attorney Daniel Park, who claimed to

3   have conducted investigation and have knowledge of facts in support of allegations

4   supporting the *Spangler* action. Safarian decl., ¶ 3. This *verbal* evidence, combined

5   with circumstantial evidence concerning the timing of construction concerning the

6   development of the Cosmopolitan, justified the filing. *Id.* Regrettably, Plaintiffs'

7   counsel launched a spurious attack regarding that action without evidence. In other

8   words, they have acted in "bad faith" and "multiplied proceedings."

9      4.  As established in greater detail below, Plaintiffs claim Mr. Safarian

10  "multiplied proceedings" and "used dispositive motions" to increase the cost of

11  litigation is meritless. It is unclear if Plaintiffs are referring to the "**four**"

12  jurisdictional (there was only one), or the anti-SLAPP motion, which was

13  meritorious, and attached for the Special Master, in full, to eliminate any further

14  debate about the merits of same. Plaintiffs have presented half-truths and gross

15  misstatements of the proceedings, apparently expecting Mr. Safarian would not

16  come forward with evidence of what actually transpired. Again, Plaintiffs' charges

17  are meritless, and knowingly advanced in bad faith.

18     Plaintiffs' attorneys' meritless accusations are consistent with a pattern

19  Plaintiffs and their counsel have been abusing for years. This Motion (like the last

20  one, which the Special Master denied, and the one before that, which the Special

21  Master granted based upon what are now confirmed to have been false

22  representations that Obenstine's "boxes" and laptop were never disclosed) is

23  comprised of demonstrably false statements and inflammatory rhetoric. There is

24  simply no evidence of any "vexatious" or "bad faith" conduct by Mr. Safarian, much

25  less conduct that "multiplied" proceedings. The same cannot be said for Plaintiffs'

26  counsel. Obenstine should be permitted to file his own Motion for Sanctions.

27  Plaintiffs' counsel should be admonished for filing a meritless Motion where the

28

OPPOSITION TO MOTION FOR SANCTIONS PURSUANT § 1927

evidence overwhelming confirms the Motion is based on a series of demonstrably false representations calculated to mislead the Special Master.

## II.

## ARGUMENT.

**A. Plaintiffs' Motion for Sanctions Pursuant to Section 1927 is Without Merit, and the Motion Itself was Filed in Bad Faith.**

Liability under Section 1927 may only arise upon a finding of recklessness or subjective bad faith. *See Lahiri v. Universal Music and Video Distribution Corp.*, 606 F.3d 1216, 1218 (9th Cir. 2010), citing *B.K.B. v. Maui Police Dep't.*, 276 F.3d 1091, 1107-08 (9th Cir. 2002)) and *Salstrom v. Citicorp Credit Servs.*, 74 F.3d 183, 184-85 (9th Cir. 1996). "Because Section 1927 is penal in nature, it should be strictly construed so that it does not 'dampen the legitimate zeal of an attorney in representing his client.'" *Lee v. L.B. Sales, Inc.*, 177 F.3d 714, 718 (8th Cir. 1999) (quoting *Travelers Ins. Co. v. St. Jude Hosp. of Kenner La., Inc.*, 38 F.3d 1414, 1416 (5th Cir. 1994)).

The Ninth Circuit utilizes a *subjective* standard in assessing an attorneys' alleged "bad faith." *Pacific Harbor Capital, Inc. v. Carnival Air Lines, Inc.* (9th Cir. 2000) 210 F.3d 1112, 1118. Thus, the Ninth Circuit has emphasized that "only conduct rising to the level of maliciousness, vexatiousness or bad faith warrants section 1927 sanctions; negligence—even gross negligence—is not enough." *Blumberg v. Gates*, 152 Fed. Appx. 652, 654 (9th Cir. 2005) (citing *Gomez v. Vernon*, 255 F.3d 1118, 1134-35 (9th Cir. 2001)); *see also In re Keegan*, 78 F.3d 431, 436 (9th Cir. 1996) (bad faith requires attorney to "knowingly or recklessly raise[] a frivolous argument, or argue[] a meritorious claim for the purpose of harassing an opponent.") (citations omitted).

Moreover, the language of section 1927 limits the Court's sanction to power to attorney actions that multiply the proceedings in the case before the court. *GRiD*

4

*Systems Corp. v. John Fluke Mfg. Co., Inc.* (9th Cir. 1994) 41 F.3d 1318, 1319. And, the Ninth Circuit holds that specific findings of *wrongful intent* are required to support section sanctions. *Primus Automotive Fin'l Services, Inc. v. Batarse* (9th Cir. 1997) 115 F.3d 644, 649—findings required to ensure that "restraint is properly exercised." Also, under section 1927, however, where conduct (e.g., filing a motion) is non-frivolous, it must be intended to harass. See *In re Keegan Management Co., Securities Litigation,* 78 F.3d 431, 436 (9th Cir. 1995) ("if [a motion] is not frivolous, it must be intended to harass.").

As explained below, none of the conduct of Obenstine satisfies the strict requirements for sanctions under Section 1927. And, sadly, many of Plaintiffs' representations are incomplete or false as easily established below. Accordingly, not only should the Motion be denied, but Obenstine should be permitted to file his own Motion for Sanctions against Plaintiffs, who have now filed three separate and entirely meritless sanctions motions, all based upon manifestly false representations.

**B.** **Sanctions Under the Court's Inherent Authority Should Be Denied Because the Court Did Not Authorize Such a Motion, and Because There Was no "Bad Faith Conduct" or "Willful Disobedience" of an Order.**

The Court's Minute Order Authorizing the filing of a Motion for Sanctions was limited to a Motion Pursuant to Section 1927. (Doc. No. 468.) The Court *did not* permit Plaintiffs to file a Motion pursuant to the Court's inherent authority. *Id.* Because "courts first should turn to specific rules tailored for the situation at hand … to justify sanctions," invoking inherent power only where there is a "need to do so," and the Court only authorized a Motion under Section 1927, the Motion under the Court's inherent power is entirely frivolous, and a violation of the District Judge's Order. *Sentis Group, Inc. v. Shell Oil Co.* (8th Cir. 2009) 559 F.3d 888, 900.

Even ignoring the fact the Court did not authorize a Motion pursuant to the Court's inherent authority, the evidence compellingly establishes that sanctions are

1    not proper. A federal court's inherent power to impose sanctions is limited to cases

2    involving "bad faith" in litigation or "willful disobedience" of a court order.

3    *Chambers v. NASCO, Inc.* (1991) 501 US 32, 43, 111 S.Ct. 2123, 2132; *Roadway*

4    *Express, Inc. v. Piper* (1980) 447 US 752, 764-766, 100 S.Ct. 2455, 2463-2464. The

5    Court's inherent power "is not a broad reservoir of power, ready at an imperial hand,

6    but a limited source; an implied power squeezed from the need to make the court

7    function." *Chambers v. NASCO, Inc.*, supra, 501 US at 42, 111 S.Ct. at 2131

8    (internal quotes omitted). Moreover, "(b)ecause inherent powers are shielded from

9    direct democratic controls, they must be exercised with restraint and discretion."

10   *Roadway Express, Inc. v. Piper*, supra, 447 US at 764, 100 S.Ct. at 2463; *In re*

11   *Peters* (2nd Cir. 2011) 642 F.3d 381, 384—when court is accuser, fact finder and

12   sentencing judge all in one, restraint and discretion required.

13         Before a court may impose sanctions under its inherent power, it must find

14   that the lawyer or party "acted in bad faith, vexatiously, wantonly or for oppressive

15   reasons." *Chambers*, supra, 501 US at 45-46, 111 S.Ct. at 2133; see also *Alyeska*

16   *Pipeline Service Co. v. Wilderness Society* (1975) 421 US 240, 258-259, 95 S.Ct.

17   1612, 1622; *Wolters Kluwer Fin'l Services, Inc. v. Scivantage* (2nd Cir. 2009) 564

18   F.3d 110, 114. Sanctions under the court's inherent power are *never appropriate* for

19   mere *negligent* conduct. *Sherman v. Rinchem Co., Inc.* (8th Cir. 2012) 687 F.3d 996,

20   1006-1007—sanctions inappropriate when destruction of evidence merely negligent,

21   nonintentional and not in bad faith. *Trade Well Int'l v. United Central Bank* (7th

22   Cir. 2015) 778 F.3d 620, 627—evidence of attorney's mistake or carelessness not

23   enough. Likewise, even recklessness by itself does not justify sanctions under the

24   court's inherent power. *Fink v. Gomez* (9th Cir. 2001) 239 F.3d 989, 994.

25         And, "inherent power" sanctions are improper where a Rule 11 motion was

26   available. "We must be especially cautious in invoking inherent authority to cure a

27   procedurally defective Rule 11 order, lest … the restrictions in [Rule 11] become

28   meaningless." *Hutchinson v. Pfeil* (10th Cir. 2000) 208 F.3d 1180, 1186-1187.

OPPOSITION TO MOTION FOR SANCTIONS PURSUANT § 1927

## III.

## PLAINTIFFS FAIL TO OFFER ANY EVIDENCE OF CONDUCT JUSTIFYING SANCTIONS, BASED ON "WITHHOLDING OF EVIDENCE" AND PRESENT A SKEWED, INCOMPLETE, OR PROVABLY FALSE NARRATIVE IN SUPPORT OF A MERITLESS MOTION.

### A. The Court Already Ruled on the Issue of the Laptop and "Boxes of Documents" Obenstine Purportedly Failed to Disclose, Rendering a Further Sanctions Motion Duplicative, Harassing, and Improper.

Plaintiffs' Motion leads off with further discussion about Obenstine's alleged failure to disclose he had a laptop and "boxes" of documents. But, the Special Master and Court already ruled on that issue. Plaintiffs vexatiously seek to "double dip," and seek additional fees relating to an issue the Special Master and District Judge addressed months earlier. Thus, Plaintiffs are engaged in the same "bad faith," "vexatious" practices they accuse Obenstine and his counsel of.

### B. Plaintiffs' Repeated Allegations Obenstine Failed to Disclose Documents or a Laptop Are Manifestly False, as Court Transcripts Confirm These Materials Were Disclosed Three Years Ago.

Plaintiffs' contention Obenstine "Failed to produce, or even identify, any of over 30,0000 emails ultimately produce by Crestridge" is manifestly false. As a preliminary matter, Plaintiffs have put forth no evidence Obenstine was required to do more than identify the records, and it is clear he did so three years ago.

Plaintiffs previously took the same "failure to disclose" position with respect to their initial sanctions Motion filed pursuant to Rule 37, and seek to re-litigate the same issue. That Motion (like this one) was based on Plaintiffs' false contention Obenstine/his counsel concealed that Obenstine had "boxes" of documents with evidence, and a computer, until his September 2015 deposition. In opposing the

7

1   Motion, Obenstine took the position these materials were previously disclosed, and

2   Plaintiffs' counsel insisted, *under oath*, that Obenstine never made such a

3   disclosure. Ironically, Plaintiffs' Motion confirms Obenstine disclosed the existence

4   of the "boxes" in 2013 (two years before he candidly disclosed the same at his

5   deposition), as well as the computer that failed, but Plaintiffs waited until after the

6   deadline to file discovery motions to bring a Rule 37 Motion to feign "prejudice."

7       Mr. Alikani's declaration in support of the Motion states, "Attached to this

8   declaration as Exhibit 6 is a true and correct copy of is a true and correct copy of

9   [sic] excerpts from the transcript of the hearing on **January 31, 2013**, where Mr.

10  Safarian presented to the Court that Mr. Obenstine found a few emails after going

11  through '**boxes'** of files and made a representation about the Crestridge server."

12  Alikani decl. in support of § 1927 Motion, ¶ 10 (Emphasis added). Thus, Plaintiffs'

13  prior representation they did not know about the "boxes" until the September 2015

14  Obenstine deposition was clearly **false**.

15      Mr. Alikani's statement that the representations were about the Crestridge

16  server was also **false**. The "server" referred to was clearly the computer Plaintiffs'

17  falsely claimed Mr. Obenstine concealed. This is confirmed by the following

18  statement by Mr. Safarian to the Court, confirming it was not the Crestridge server

19  that had "issues," which he had been seeking access to only to have Plaintiffs'

20  counsel coordinate with Crestridge to block access to the server and reveal the truth:

21
22   9          Mr. Obenstine affirms:  I never deleted a single e-
23  10   mail from that account; why is this not there?  And Mr. Ray --
24  11   Mr. Fay made the comment that we've been resisting producing
25  12   these things, we've been fighting him on it.  Well, we've been
26  13   asking all along:  Let us get to the Crestridge server; let's
27  14   get to the truth of what the jurisdictional documents are.  The
28  15   plaintiff has actually resisted our opportunities to do that.
    16   We think that there is more material out there that will
    17   resolve this jurisdictional question once and for all.  But
    18   it's the plaintiff that has said:  No, you should not be
    19   allowed to go and look at Crestridge's server.

OPPOSITION TO MOTION FOR SANCTIONS PURSUANT § 1927

1    Alikani decl., Ex. 6, 44:9-19.

2         Indeed, Mr. Safarian confirmed in open Court more than three years before

3    the Court granted the first sanctions motion that Obenstine did have access to a

4    computer that was not functioning properly. Specifically, he stated in open court, on

5    **December 10, 2012**, "A lot of the documents, unfortunately, *it's my understanding*

6    were destroyed or *on a server that became an issue* in this case." *See* Alikani decl.

7    in support of § 1927 Motion, Ex. 5, 7:6-10. Thus, although Plaintiffs knew for

8    nearly three years prior to Obenstine's deposition that Obenstine had a computer

9    with "issues," they stated otherwise to the Special Master and the Court in sworn

10   declarations in order to set up a meritless sanctions motion, making every effort to

11   avoid having the case resolve on its merits and, instead, trying incessantly to poison

12   the Court against Obenstine based upon materially false statements. Plaintiffs'

13   counsel deliberately waited until after discovery closed, falsely representing they

14   were never told of the materials until Mr. Obenstine's September 2015 deposition. It

15   is clear Plaintiffs deliberately waited to create a false narrative of "prejudice," and

16   acted in "bad faith" and "vexatiously" to "multiply proceedings."

17        And, importantly, the Special Master's recommendations on the Motion for

18   Sanctions states, in footnote 6, that:

19
20        Plaintiffs note that they have evidence of at least one email
          from Defendant Obenstine regarding the Cosmopolitan
          matter which was not produced by Crestridge Partners,
21        Inc.; thus, Plaintiffs suspect there are other emails
          regarding the Cosmopolitan matter from Defendant
22        Obenstine, who used email addresses in addition to the
          Crestpar email address, which have not been produced to
23        them by Crestridge Partners, Inc., and others.

24        The "one email" referred to was a "smoking gun email" that was conveniently

25   omitted from the productions made by Crestridge, eviscerating Plaintiffs' theory

26   Obenstine used his secretary as a "capper" to solicit Estakhrian as a client. See

27   Safarian decl., ¶ 4 Ex. "A." The fact this "smoking gun" document, which confirms

28   Obenstine did not use a "capper" to solicit Mr. Estakhrian, is compelling evidence

9

Mr. Jafary of Crestridge, who coordinated the Crestridge production with Plaintiffs' attorneys, deliberately omitted key evidence from the production. As the Special Master is also aware, Mr. Obenstine previously offered Plaintiffs' counsel the laptop in question prior to the filing of the first sanctions Motion and invited Plaintiffs to compare the Crestridge documents with the entirety of his emails to confirm Plaintiffs were deprived of no materials. Safarian decl., ¶ 4. Plaintiffs declined the offer. *Id.* Their reasoning for doing so is transparent: there was nothing to be gained from the laptop because they already had all relevant materials from the Crestridge production, and accepting the offer would thwart their ability to file a meritless sanctions motion.

As indicated, the Special Master's decision to recommend sanctions against Mr. Obenstine based upon the purported non-disclosure was based upon the parties' conflicting positions as to whether Mr. Obenstine actually disclosed the boxes of documents and computer. The Special Master's "Order Granting Plaintiffs' Motion for Sanctions" (Dkt. No. 422) states:

> One of the purposes of requiring written disclosures, written responses to discovery requests, and written supplementation of prior disclosures and responses is to prevent discovery motions from being based on "he said; she said." Further, it appears to the Special Master that the practice of counsel during the course of this litigation has been to routinely memorialize in writing all conversations and occurrences. Without documentary evidence to support the claim that his attorney verbally disclosed the laptop and bankers' boxes documents, the Special Master finds no merit to this defense by Defendant Obenstine.

*Id.* at 14:7-13.

It is now clear and documented in the transcripts of the December 10, 2012 and January 31, 2013, and Mr. Alikani's declaration submitted in connection with the section 1927 Motion, that Mr. Safarian *did* disclose the boxes and computer. There is no longer a "he said – she said" debate. Plaintiffs had actual knowledge of the boxes and computer for years, and acted in "bad faith" by representing, under oath, that these materials were concealed.

A failure to document the existence of the laptop or boxes—which were disclosed in open Court and numerous times in verbal meet and confer discussions with Plaintiffs' counsel (including Karla Gilbride, who handle most of the communications on the subject for Plaintiffs, but has yet to submit a declaration with respect to any of the issues here), at worst, constitute a simple oversight. But, there is no longer any question that these materials were disclosed, and the issue certainly does not merit sanctions against Mr. Safarian under section 1927. On the contrary, Plaintiffs' attorneys' repeated false statements on the subject were clearly in bad faith, vexatious, and multiplied proceedings. As such, the Special Master should authorize a sanctions motion against Plaintiffs/their counsel.

### C. **Plaintiffs' Speculation Mr. Safarian "Failed to Identify or Produce Documents Used in Another Action" is False.**

Plaintiffs speculate Mr. Safarian must have had a treasure trove of documents relating to the *Spangler* action when he filed it. That is not true, and Plaintiffs have proffered no evidence to support such speculation. The *Spangler* lawsuit was filed based upon information Mr. Obenstine received *verbally* from attorney Daniel Park. Safarian decl., ¶ 3. Plaintiffs have chosen to ignore Mr. Obenstine's deposition confirming this. Mr. Obenstine testified at deposition that he had been in communications with attorney Daniel Park, who had been investigating potential claims relating to the Cosmopolitan. Safarian decl., ¶ 3, Ex. "B," pages 383:7-12; 384:20-385:9; 396:23-397:2.

The fact is that the *Spangler* action was filed based upon information provided verbally to Mr. Safarian. Plaintiffs hyperbolic and inflammatory attack that it "defies credulity" that the lawsuit would be filed without documents, or that the filing violated Rule 11, ignores that documents are not required to file an action. Attorney Park provided sufficient information, and there was ample information publically available about the progress of the construction of the Cosmopolitan that

more than justified filing suit. Safarian decl., ¶ 3. The timing of the construction of the Cosmopolitan as a "hotel" development rather than a "condominium" development was circumstantial evidence that counsel for Obenstine believed proved to be sufficiently strong evidence to file the *Spangler* case. *Id*. Plaintiffs' speculation and hyperbolic attacks are not evidence of "bad faith" or vexatious litigation tactics, and there is no evidence the filing of the *Spangler* action "multiplied proceedings."

Plaintiffs concede the *Spangler* case was dismissed almost as soon as it was filed. Plaintiffs' Motion correctly states, "Mr. Safarian also stated that he was hoping that discovery [in Spangler] would lead to evidence supporting the claims, but since he could not find the supporting evidence, the case was dismissed." Plaintiffs' rampant speculation Mr. Safarian "must have" had documents supportive of the theories in the *Spangler* case is simply untrue, and the suggestion documents were withheld are false. Plaintiffs' counsel could easily go visit the Cosmopolitan and determine for themselves that the development is not a condominium development, and can easily "Google" the same information Obenstine and/or his counsel did.

Plaintiffs further take the position that they were denied in the initial disclosures served in this action, and discovery responses, information pertinent to the *Spangler* case, and that the Special Master should just "presume" wrongdoing. The requested sanctions are serious. There is not a scintilla of evidence there was any information from the short-lived *Spangler* case, which was filed *years* after initial disclosures were made in this case. The Court cannot simply "presume" bad faith. Plaintiffs have done nothing to carry their burden aside from speculating and name-calling. Their Motion should be denied.

12

**IV.**

**PLAINTIFFS PROFFER NO EVIDENCE OF ANY "FRAUD" UPON THE
COURT BY OBENSTINE, BUT THERE IS SIGNIFICANT EVIDENCE OF
SUCH FRAUD BY PLAINTIFFS AND THEIR COUNSEL.**

    **A.** **Plaintiffs' Assertion Mr. Safarian Falsely Represented that the Emails
on Mr. Obenstine's Laptop Mirrored Those in the Crestridge Server
are Knowingly False.**

Plaintiffs knowingly misstate the evidence in order to persuade the Special Master that Mr. Safarian sought to mislead the Court in stating that Mr. Obenstine's laptop did not contain information that was not already on the Crestridge server. This is easily disproven. Mr. Obenstine filed a Motion for Protective Order and Sanctions. Working hand-in-hand with Mr. Jafary, Plaintiffs had his full cooperation and secured a signed declaration from him, the contents of which are demonstrably and materially false. See Jafary declaration (Doc. No. 62-6) attached as Ex. "C" to Safarian decl. Mr. Jafary declared that, in responding to a subpoena issued in 2011 for Mr. Obenstine's emails, Mr. Jafary "conducted searches on Crestridge's server for emails to or from address mark@crestpar.com concerning the Cosmopolitan litigation for 'Cosmo' and 'Cosmopolitan' and key words." Id. at ¶ 10.

Then in 2014, Mr. Safarian was able to secure from Crestridge the entirety of Mr. Obenstine's email account. Safarian decl., ¶ 5. Amazingly, that production included a smoking gun email eviscerating Plaintiffs' claim that Mr. Obenstine "recruited" Mr. Estakhrian. The attached "smoking gun" email (Ex. "A") has the following subject line, confirming Mr. Jafary's search query should have identified it, and Crestridge should have produced it but, somehow, it was mysteriously missing, defying the laws of computer science:

| From: | Reza Jafary |
|---|---|
| To: | Mark Obenstine |
| Subject: | Re: Cosmo New Client |
| Date: | Tuesday, March 3, 2009 12:13:18 AM |

13

1    That email chain also included the following text:

2        Mark,

3        I spoke to "James Estakhrian" today and he wants to Join the Cosmo Class Action lawsuit.
         Please send me an engagement letter for his name also and I believe his e-mail is
4        estak1@hotmail.com However, I am not so sure about that but I will verify his e-mail today
         by end of the day.

5        H also wants the same deal as Houshang Karimi (the guy we spoke yesterday).

6        Best Regards,

7        Reza Jafary

8        Reza,

9        Feel free to forward the Cosmopolitan materials delivered to you this morning to Mr. Estakhrian.  Thank you for
         your kind assistance.

10       Best Regards,

11       Mark R. Obenstine, Esq.

12       This begs the question: if Crestridge, in its collaborations with Plaintiffs'

13   attorneys, produced all of Mr. Obenstine's emails containing the search terms

14   "Cosmo" and "Cosmopolitan," how is it that the one email that destroys Plaintiffs'

15   "capper" hypothesis simply disappeared when Crestridge produced records early on

16   in the case, and then re-appeared years later when Crestridge sent Mr. Obenstine the

17   entirety of Mr. Obenstine's email account? Moreover, Plaintiffs' counsel was

18   provided an exact digital duplicate copy of the entire Crestridge email account for

19   Mr. Obenstine. Curiously, they offer no indication that any of the meta data files

20   evidence any records as having been deleted.

21       Simply stated, the evidence is clear (and scientifically irrefutable) that (1)

22   Crestridge, in coordinating the productions with Plaintiffs' counsel, manipulated

23   data, purging the email that eviscerates Plaintiffs' "capper" theory and obliterating

24   the credibility of Mr. Estakhrian, who denied *under oath* at deposition that Mr.

25   Jafary referred him to Mr. Obenstine, (2) Mr. Obenstine has repeatedly told his

26   counsel (and has stated in his declaration to the Special Master) that there are no

27   emails relating to the Cosmopolitan on his laptop that were not already on the

28   Crestridge server (all of which were produced more than a year ago without a single

14

OPPOSITION TO MOTION FOR SANCTIONS PURSUANT § 1927

1  character being redacted—a fact the digital files produced to Plaintiffs can confirm),

2  and (3) there is not a scintilla of evidence Mr. Safarian misstated anything.

3      Furthering their hyperbolic rhetoric, Plaintiffs exclaim, "It is beyond belief

4  that someone who has no access to emails could somehow compare over 30,000

5  emails and discovery that a few emails are missing" and that the "missing emails are

6  a fable created by Mr. Obenstine and Mr. Safarian to justify their previous

7  misrepresentations and discovery abuses." First, the verification that the laptop and

8  Crestridge server have the identical emails is one that is easily and logically arrived

9  at. Mr. Obenstine stated that he made a duplicate of the Crestridge server onto his

10  laptop. It is no different than backing up all of one's emails onto an external hard

11  drive. Would there be any need to review and compare each and every email to

12  affirm the data was identical if the transfer process was correct? Of course not.

13      The chronology above clearly confirms the only "fable" is the one

14  orchestrated to cover up a single "smoking gun" chain of emails that destroys

15  Plaintiffs' "capper" theory. Mr. Obenstine and his counsel have repeatedly offered

16  the laptop at issue to Plaintiffs' counsel so they could confirm this themselves, but

17  they have refused it. Given what is at issue in this case, why do so?

18      Plaintiffs' strenuous efforts to persuade the Court that Mr. Safarian "lied" to

19  the Court above documents is simply without merit—and destroys Plaintiffs' prior

20  statements ***under oath*** that Mr. Safarian never disclosed that Mr. Obenstine had

21  boxes of materials or a laptop. Ultimately, any information Mr. Safarian shared with

22  the Court was based upon information he received from his client and relied upon.

23  There is no evidence Mr. Safarian misstated anything to the Court with regard to the

24  laptop, "boxes," or any other matters. And, as established, "An attorney is **entitled**

25  **to rely** on his or her client's statements as to factual claims when those statements

26  are objectively reasonable." *Hadges v. Yonkers Racing Corp.*, 48 F.3d 1320, 1329

27  (2d Cir. 1995) (emphasis added). All of the representations Mr. Safarian made to the

28  Court about what documents Mr. Obenstine had were based upon his

15

1  communications with Mr. Obenstine, and there is no evidence that Mr. Obenstine

2  was untruthful with regard to those matters.

3        Again, the events lead to one consistent and irrefutable conclusion: the only

4  "bad faith" or "vexatious" conduct is by Plaintiffs and their counsel, who have

5  repeatedly and falsely stated they were *never* informed of "boxes" or a laptop. Now,

6  faced with an opportunity to fabricate a narrative to attempt to obtain sanctions,

7  Plaintiffs go in an entirely different direction.

8        More disturbing is the fact that Plaintiffs knowingly advanced a flawed

9  "capper" theory in order to extort settlement funds from Mr. Obenstine. In spite of

10  compelling evidence this theory was false, they forced Obenstine to defend the

11  theory, and then abandoned it when the class certification briefs were filed. Safarian

12  decl., ¶ 6. Obenstine incurred extraordinary fees defending a meritless claim for

13  nearly five years. If anything justifies sanctions, it is this conduct, and Obenstine

14  should be permitted to seek sanctions against Plaintiffs and their counsel.

15

16                                    **V.**

17  **PLAINTIFFS' EVIDENCE OF ALLEGED "VEXATIOUS**

18  **MULTIPLICATION OF PROCEEDINGS AND DILATORY TACTICS" IS**

19  **DELIBERATELY INCOMPLETE OR INACCURATE.**

20      A. **Plaintiffs' Contention Obenstine's Counsel Objected to Discovery in**

21         **Bad Faith is Without Merit.**

22        Plaintiffs suggest Obenstine's counsel must have acted improperly in

23  adopting the view jurisdictional discovery would be limited to specific limited

24  jurisdiction. It is clear, however, that Judge Feess' original Order clearly stated there

25  was no basis for general jurisdiction, and that Estakhrian failed to put forth enough

26  evidence to carry his burden of proof regarding general jurisdiction. A reading of

27  the Court's Order confirms it was more than reasonable for Mr. Safarian to interpret

28  the Court's ruling to mean the Court identified the only potential basis for

1   jurisdiction (and, by extension, jurisdictional discovery) was specific limited

2   jurisdiction. Under section B.1.a. of the Order, which discussed general jurisdiction

3   with respect to the claims against Mr. Obenstine, Judge Fess concluded:

> Although Plaintiff endeavors to prove that Obenstine's contacts with California are ongoing, continuous, and systematic, Plaintiff fails to establish that this Court can exercise general jurisdiction over him.
>
> ***
>
> [o]ne contact with California is insufficient to authorize this Court to exercise general personal jurisdiction. One contact is not "continuous and systematic," and therefore does not approximate physical presence in the state

11   Doc. No. 46 (Attached to Safarian decl. as Ex. "D.")

12          Moreover, under the referenced "general jurisdiction" heading, the Court's

13   Order said nothing about allowing jurisdictional discovery. In contrast, under the

14   "specific jurisdiction heading (B.1.b.), the Court stated, "Plaintiff's showing is

15   sufficient to entitled him to limited jurisdictional discovery." *Id.*

16          Moreover, the objections to interrogatory number 7 were not based solely

17   because it sought information concerning general jurisdiction. Rather, the request

18   was procedurally improper because it contained seven separate sub-parts in

19   violation of Rule 33(a)(1). The numerical limit on interrogatories is designed to

20   provide judicial scrutiny before parties make potentially excessive use of this

21   discovery method. [Adv. Comm. Notes on 1993 Amendments to FRCP 33(a)(1)]. It

22   is well established that questions asking for information about separate subjects

23   count as several. See *Kendall v. GES Exposition Services, Inc.* (D NV 1997) 174

24   F.R.D. 684, 686; *Collaboration Properties, Inc. v. Polycom, Inc.* (ND CA 2004) 224

25   F.R.D. 473, 475—single interrogatory seeking information about 26 separate

26   products in a patent case held to contain 26 discrete subparts.

27          Plaintiff's counsel lament of "false promises and delays," but has put forth no

28   evidence of any meet and confer on the issue. Nor has Plaintiff indicated a motion to

1  compel was filed. And, there is no question Obenstine was not required to answer

2  interrogatory number seven, as it was seven separate interrogatories packaged as

3  one, and Plaintiffs' counsel refused to re-serve the request and break down the

4  requests. Safarian decl., ¶ 8.

5       Mr. Safarian did have conversations with Plaintiffs' attorney Karla Gilbride

6  on the issue, and the parties reached an impasse. Safarian decl., ¶ 8. The notion a

7  disagreement on a single interrogatory somehow justifies a section 1927 Motion, or

8  sanctions under the Court's inherent authority, is incongruous. If that were the case,

9  every discovery motion would justify punitive relief. It is also unreasonable for

10  Plaintiffs to wait nearly five years to come forward with a section 1927 Motion

11  complaining about a few discovery responses—especially where the requests were

12  facially defective, and reasonable given the language of Judge Feess' Order, which

13  Plaintiffs' conveniently neglected to attach.

14       Additionally, Plaintiffs go to lengths to explain *why* objections were lodged

15  concerning Mr. Obenstine's residence, and assume Mr. Obenstine had some

16  nefarious justifications for refusing to answer questions about where he lived. It is

17  important, however, that Plaintiffs proffer no evidence concerning Mr. Safarian's

18  motives. Whether Mr. Obenstine had bad motives is not the issue. The evidence is

19  clear: Mr. Safarian relied on his client's signed declaration confirming his Nevada

20  residency, and was justified in raising a jurisdictional challenge. There was no

21  "nefarious" scheme to object to the few discovery requests Plaintiffs point to.

22

23      **B.** <u>**The Motion to Dismiss for Lack of Personal Jurisdiction was Proper,**</u>

24          <u>**as Was the Renewal of the Motion**</u>.

25       Plaintiffs' go to lengths to persuade the Special Master that Obenstine's "**four**

26  frivolous motions to dismiss for lack of personal jurisdictions [sic]" were somehow

27  filed in bad faith. But, Obenstine **<u>filed only one</u>** Motion to Dismiss for lack of

28  personal jurisdiction, and renewed that Motion two years later, which the Court

denied without prejudice. And there is not a scintilla of evidence supporting the speculation the Motion, or any part of it, was filed in bad faith. Rather, Plaintiffs appear to suggest the Court should merely *assume* the Motion was meritless because, after years of litigating personal jurisdiction, Mr. Obenstine became personally and financially exhausted from dealing with the issue, and chose to defend Plaintiffs' meritless lawsuit on the merits, and asked the Court to rule on his anti-SLAPP Motion (which never occurred). Safarian decl., ¶ 3.

Moreover, not only is there no evidence that the jurisdictional challenge was filed in bad faith, it is abundantly clear Mr. Safarian had substantial information justifying the motion, and the failure to file it could have been malpractice. Our Courts are clear: "An attorney is **entitled to rely** on his or her client's statements as to factual claims when those statements are objectively reasonable." *Hadges v. Yonkers Racing Corp.*, 48 F.3d 1320, 1329 (2d Cir. 1995) (emphasis added). Specifically, Mr. Obenstine, a licensed attorney, signed a declaration under oath on August 24, 2011 confirming the following facts—none of which Plaintiffs are able to refute as untrue:

1. That Mr. Obenstine moved to Las Vegas in 2009,
2. That Mr. Obenstine was still a Nevada resident as of the signing of his declaration in 2011,
3. That Mr. Obenstine intended to remain in Nevada "indefinitely,"
4. That Mr. Obenstine signed Plaintiff Estakhrian's engagement letter in Nevada (there is no dispute Plaintiff Naziri never retained Mr. Obenstine);
5. That Mr. Obenstine *never* met Plaintiff, never talked to Plaintiff, and never communicated with Plaintiff,
6. That the Cosmopolitan action was litigated exclusively in Nevada.

(Doc. No. 26.)

1    Thus, there was ample evidence at the time the Jurisdictional Challenge was

2    raised that it was meritorious. Indeed, Judge Feess, who was presiding over the case

3    at the time, agreed, and stayed proceedings pending jurisdictional discovery.

4    Plaintiffs make much of the fact the jurisdictional challenge was withdrawn.

5    The jurisdictional challenge was withdrawn because Obenstine grew tired of

6    litigating that issue for *years*, found it was unlikely the Motion would be ruled upon

7    anytime soon, and chose to defend the case on its merits. Safarian decl., ¶ 3. There is

8    nothing "vexatious" or "bad faith" about the matter. The withdrawal is in no way

9    indicative the motion was without merit when filed. The mere fact a client agreed to

10   withdraw a defense does not mean his lawyer acted in "bad faith" when the lawyer

11   filed the challenge. But this speculation is all Plaintiffs rely upon and, in doing so,

12   have advanced papers with zero evidentiary support and zero merit.

13   The only "bad faith" here is Plaintiffs' unfortunate effort to continue to

14   raising meritless attacks against Obenstine/his counsel, all of which are unsupported

15   by the facts or law. Because Plaintiffs' counsel knowingly advance arguments that

16   are without merit, and Obenstine should be allowed to file a Motion for Sanctions.

17

18   C. **Plaintiffs' Narrative Concerning the Motion to Quash/Protective**

19   **Order Regarding the Stringfellow and Cracolice Depositions is**

20   **Deliberately Incomplete and False.**

21   Plaintiffs claim Mr. Obenstine raised a challenge to the Stringfellow and

22   Cracolice deposition merely upon the grounds of "relevancy." Motion 20:1-16. This

23   is false. Plaintiffs deliberately ignore the fact the Motion was actually made to

24   ensure compliance with a confidentiality agreement. (See Doc. No. 242, 1:16-2:11.)

25   In short, a settlement had been reached between Mr. Obenstine and the two

26   attorneys. The agreement included a confidentiality provision stating:

27          The parties acknowledge that the terms and conditions of

28          this Agreement, the existence and terms of a dispute

20

1    between the parties, and terms of a settlement between the

2    parties, the involvement of Defendant in the two lawsuits

3    referenced above (collectively, "the Dispute and

4    Settlement"), and any documents relating to or produced in

5    connection with the two lawsuits referenced above

6    (including but not limited to any electronic documents or

7    facsimiles, recordings, or video) ("Documents" are strictly

8    confidential; and the parties further agree that they will not

9    publicize, discuss, disclose, disseminate, or reveal the

10   Documents or the existence or terms of the Dispute and

11   Settlement, including but not limited to whether or not any

12   amount was paid, the amount of payment, or the opinions

13   the parties may have with respect to any of the events,

14   actions, discussions, or disputes concerning prior

15   agreements or understandings that relate to the Dispute

16   and Settlement to anyone other than the attorneys,

17   accountants, and immediate families of the parties unless

18   required by law.

19   See Doc. No. 242.

20           Thus, the Confidentiality Agreement relating to the settlement considered

21   information revealed during discovery to be personal and confidential. It is on this

22   basis that the Motion was made. Plaintiffs' statements to the contrary (like many of

23   their other statements) are simply false.

24           Moreover, it is undisputed Mr. Safarian asked Plaintiff's counsel for an offer

25   of proof as to the relevance of that Motion, but Plaintiffs' counsel took the position

26   it was not required to offer one. (See Doc. No. 242, 2:12-20.) Given this refusal, and

27   the strict confidentiality language, Mr. Safarian acted properly in seeking the

28   Court's protections.

OPPOSITION TO MOTION FOR SANCTIONS PURSUANT § 1927

1    Plaintiffs further complain that, on July 25, 2015, Mr. Safarian "falsely"

2  stated that the Court ordered that private financial information be redacted from the

3  transcript. Plaintiffs neglect to mention that in her rulings concerning the Crestridge

4  production, Judge Woehrle determined private financial information could not be

5  discovered and/or should be redacted. Safarian decl., ¶ 9. It was on this basis that

6  the issue was raised. Conveniently, Plaintiffs fail to mention this fact. Regardless,

7  there is no dispute that once Mr. Safarian received the transcript, he promptly

8  reviewed it and, ***within three hours' time***, confirmed "***I have now read the***

9  ***transcript and have no objection***." (Motion, 20:17-24.)

10   Does a lawyers' exercise of caution and insistence on reviewing a transcript

11  that is protected by a strong confidentiality agreement and may contain private

12  financial information constitute "bad faith," "vexatious" conduct that multiplies

13  litigation? As discussed, our Courts are clear that Section 1927 should not be

14  applied such that it dampens "the legitimate zeal of an attorney in representing his

15  client."

16

17   **D.  Obenstine Sought a Stay of Discovery Under the Anti-SLAPP Statute**

18       **Because He Was Entitled to One by Statute, and the Case Was**

19       **Financially Taxing.**

20   The Court need not look further than the anti-SLAPP motion (Doc No. 29) to

21  confirm it was filed (and renewed) with merit. Initially filed with Judge Feess, that

22  Motion was never ruled upon because of the jurisdictional challenge. The Motion

23  was then denied by Judge Olguin "without prejudice," and without explanation. The

24  anti-SLAPP motion was detailed, replete with legal authority and sound

25  argumentation, and in no way meritless, but was never ruled upon. Plaintiffs fail to

26  set forth a single legal argument to suggest the Motion (which could have been

27  dispositive of the entire case), was filed or renewed merely to "delay discovery."

28  Such an insinuation is meritless. Plaintiffs simply leap to the conclusion they ***must***

1  have been meritless because Obenstine sought a stay around the same time Sanjay

2  Varma was going to be deposed.

3        Mr. Safarian's position that discovery was stayed was completely in

4  accordance with the plain language of California Civil Code section 425.16, which

5  expressly states the pendency of an anti-SLAPP motion stays discovery. Safarian

6  decl., ¶ 10. The stay was required to control mounting litigation costs, as Mr.

7  Obenstine had waited years to have the Motion heard. *Id.* Where a statute expressly

8  states that the pendency of an anti-SLAPP motion stays discovery, does a lawyer's

9  effort to trigger the statutory stay constitute "bad faith," "vexatious" conduct? The

10 mere fact the Court responded that "there is no general stay of discovery at this

11 time" does not convert a perfectly appropriate request for a stay to one that

12 deserving of penal sanctions.

13

14        **E.   The Objection to Interrogatory No. 8, Which was Procedurally**

15             **Defective and Overbroad, Was Not "Vexatious" or in "Bad Faith."**

16        Plaintiffs are correct that an objection was lodged to interrogatory number 8.

17 But Plaintiffs fail to explain how Mr. Obenstine's applications for *pro hac vice*

18 status in Nevada four years before meeting Plaintiff was "relevant to a claim or

19 defense" in this case. They also fail to explain how any *pro hac vice* admission in

20 any matter unrelated to Mr. Obenstine's representation of Plaintiff was relevant to a

21 claim or defense. Plaintiffs are correct that Mr. Obenstine could have answered the

22 question without much difficulty, but exercised his right not to do so and chose,

23 instead, to exercise his right advance objections permitted by the applicable Rules in

24 light of the fact the request was improper. While a technical objection to a single

25 interrogatory may not be cause for celebration, it is certainly not "vexatious," or in

26 "bad faith," and does not "multiply proceedings." If that is the case, then Obenstine

27 should be permitted to file a motion for sanctions against Plaintiffs and their counsel

28 for equally technical refusals to answer discovery. Moreover, raising the matter

1   nearly five years after-the-fact, without a showing of a violation of a Court Order or

2   reasonable meet and confer efforts is unreasonable.

3

4   **F.  <u>Plaintiffs Grossly Misconstrue Obenstine's Argument in Opposition to</u>**

5   **<u>Plaintiffs' Motion for Leave to Amend</u>.**

6   Plaintiffs appear to imply that Obenstine/his counsel raised a frivolous

7   argument that Plaintiff's Motion for Leave to Amend failed to satisfy a Court

8   deadline. That is entirely untrue. The Opposition filed on behalf of Obenstine (Doc.

9   No. 372) argued there was a delay because Plaintiffs were aware of the potential

10  conflict concerning Plaintiffs' counsel's continued representation of Mr. Estakhrian

11  in **<u>2013</u>**, but Plaintiffs did not seek leave to amend to add Mr. Naziri as a party until

12  **<u>2015</u>**. The fact the Court disagreed with the argument does not mean it was

13  advanced in bad faith. Indeed, the argument is supported by extensive legal

14  authorities as set forth in the Opposition, which Plaintiffs conveniently disregard in

15  their moving papers (and, instead, have suggested Obenstine somehow challenged

16  the timeliness in complying with the Court's order, as opposed to under other

17  authorities justifying denial of leave to amend where a party inexcusably delayed on

18  other grounds). Indeed, the Court acknowledged that whether "the amendment

19  causes undue delay" is a factor in considering whether leave to amend should be

20  granted. (Doc. No. 372).

21  Moreover, the mere raising of a legal argument the Court disagreed with did

22  not "multiply" proceedings. By Plaintiffs' standards, it seems any effort to defend a

23  case is "bad faith." The Court did not agree with Obenstine's argument, and

24  Plaintiffs' Motion for Leave to add Mr. Naziri as a class representative **<u>four years</u>**

25  after this action was filed was granted. Not surprisingly, Plaintiffs fail to explain

26  how this objection delayed proceedings in even the slightest way.

27

28

## G. **Obenstine's Argument Regarding Who Should Hear the Sanctions Motion Did Not "Delay Proceedings," and Does Not Justify Sanctions, and Was Not Vexatious.**

Obenstine correctly objected to Plaintiff's initial Rule 37 sanctions motion on the grounds when filed with the Court on the grounds this Special Master had been assigned to "proceed over *discovery* matters." (Doc. No. 391, 3:2-3 [emphasis added].) The fact Plaintiffs filed a Motion with the Federal Judge, in direct violation of a Court Order, clearly constitutes the type of "bad faith," "vexatious" litigation tactics Plaintiffs now duplicitously complain of. Obenstine's objection to the Special Master's Order was not made on the grounds the Special Master lacked the authority to make rulings with respect to discovery. Rather, his objection was that the Special Master, having conducted a mediation, should not have "the authority to issue severe sanctions." (Doc. No. 431, ¶ 6.) Moreover, the Objection on this basis certainly did not delay or multiply proceedings.

In contrast, Plaintiffs' filing of the sanctions motion with the Court, in direct violation of the Court's order, resulted delay, requiring the entire matter to be re-routed to the Special Master for consideration.

Clearly, Obenstine's harmless objection, made in good faith, was not conduct "rising to the level of maliciousness, vexatiousness or bad faith warrant[ing] section 1927 sanctions; negligence—even gross negligence—is not enough." *Blumberg*, 152 Fed. Appx. At 654. A determination to the contrary would clearly "dampen the legitimate zeal of an attorney in representing his client," and should not be permitted. *Lee*, 177 F.3d at 718, (quoting *Travelers Ins. Co.*, 38 F.3d at 1416.

Respectfully submitted,

SAFARIAN & BAROIAN, LLP

Date: July 22, 2016                    By: /S/   Harry A. Safarian
                                       HARRY A. SAFARIAN
                                       Attorneys for Defendant, MARK OBENSTINE

25

## DECLARATION OF HARRY A. SAFARIAN

I, Harry A. Safarian, declare and state as follows:

 1. I am an attorney at law duly licensed to practice before this Court and all courts of the State of California. I am a partner with the firm Safarian & Baroian, LLP, counsel of record for Mark Obenstine. If called upon to testify, I could, and would, competently testify to the facts herein.

 2. Plaintiffs motion for sanctions pursuant to section 1927 and the Court's inherent authority is without legal or factual merit. I have never filed a document or made a statement that was unsupported by the facts or law during the course of this case, and have never acted to vexatiously multiply proceedings. Unfortunately, and incorrectly, Plaintiffs claim I "filed and refiled four frivolous motions to dismiss for lack of personal jursdictions [sic]." (Motion, 1:20-22.) This is false. A review of the Court docket confirms only **one** such Motion was filed. And it, was filed after Mr. Obenstine provided me with a signed a declaration setting forth substantial evidence the Court lacked personal jurisdiction over him. Plaintiffs speculation my client (or I) chose to dismiss the jurisdictional challenge for some nefarious purpose is not accurate. Judge Feess authorized jurisdictional discovery in his October 24, 2011 Order (Doc. No. 46). The parties engaged in jurisdictional discovery for years. My client chose to withdraw the challenge and deal with the case on its merits after it became clear its purpose (to save time and money litigating in a distant and inconvenient forum) was defeated by the exhaustive costs of litigating the simple issue of jurisdiction. Plaintiffs' speculation to the contrary is just that.

 3. Plaintiffs also claim I somehow concealed or failed to disclose documents available to me at the time I filed the *Spangler* case. This is also false. I filed the case based upon information I received orally from my client, who had interviewed attorney Daniel Park. It was my understanding from my client that Mr. Park was also pursuing similar claims for clients as those advanced in *Spangler*. I was informed that Mr. Park conducted an investigation and had knowledge of facts

1

1  in support of allegations supporting the *Spangler* action. This *verbal* evidence,

2  combined with circumstantial evidence concerning the timing of construction

3  concerning the development of the Cosmopolitan, justified the filing. Unfortunately,

4  Plaintiffs have chosen to ignore Mr. Obenstine's deposition testimony confirming he

5  had been in communications with attorney Park, who had been investigating

6  potential claims relating to the Cosmopolitan. A true and correct copy of that

7  testimony is attached hereto as Exhibit "B."

8      4.     Also inaccurate is Plaintiffs' attorneys' contention I concealed the fact

9  Mr. Obenstine had a laptop with his Crestridge Partners emails and physical

10  documents. I identified the existence of these materials in open court in 2012 and

11  2013 with Plaintiffs' counsel present as evidenced by the transcripts, which are now

12  before the Special Master. I disclosed these materials to several of Plaintiffs'

13  attorneys' numerous times, including attorney Karla Gilbride who has yet to submit

14  a declaration to the contrary. There has been significant controversy concerning a

15  single email that was omitted from the initial Crestridge Productions. The "one

16  email" is a "smoking gun email" that eviscerates Plaintiffs' theory Mr. Obenstine

17  used his secretary as a "capper" to solicit Estakhrian as a client. The email (a true

18  and correct copy of which is attached hereto as Exhibit "A") was, however, included

19  in the massive 2014 production of *all* of Mr. Obenstine's emails. The production

20  was all in electronic format. Somehow, the one "smoking gun" email that was

21  omitted from Crestridge's earlier productions was present when Crestridge made the

22  2014 "full production." The fact this "smoking gun" document was excluded from

23  the earlier productions is compelling evidence Mr. Jafary of Crestridge, who

24  coordinated the Crestridge production with Plaintiffs' attorneys, deliberately omitted

25  key evidence from the production. As the Special Master is also aware, Mr.

26  Obenstine previously offered Plaintiffs' counsel the laptop in question prior to the

27  filing of the first sanctions Motion and invited Plaintiffs to compare the Crestridge

28  documents with the entirety of his emails to confirm Plaintiffs were deprived of no

OPPOSITION TO MOTION FOR SANCTIONS PURSUANT § 1927

1  materials. Plaintiffs declined the offer. Their reasoning for doing so is transparent:

2  there was nothing to be gained from the laptop because they already had all relevant

3  materials from the Crestridge production, and accepting the offer would thwart their

4  ability to file a meritless sanctions motion.

5          5.      As discussed in the attached Opposition, Plaintiffs knowingly misstate

6  evidence in order to persuade the Special Master that I sought to mislead the Court

7  in stating that Mr. Obenstine's laptop did not contain information that was not

8  already on the Crestridge server. This is easily disproven. I caused to be filed, on

9  behalf of Mr. Obenstine, a Motion for Protective Order and Sanctions. Working

10 hand-in-hand with Mr. Jafary, Plaintiffs had his full cooperation and secured a

11 signed declaration from him, the contents of which are demonstrably and materially

12 false. A true and correct copy of that declaration (Doc. No. 62-6) is attached hereto

13 as Exhibit "C." Mr. Jafary declared that, in responding to a subpoena issued in 2011

14 for Mr. Obenstine's emails, Mr. Jafary "conducted searches on Crestridge's server

15 for emails to or from address mark@crestpar.com concerning the Cosmopolitan

16 litigation for 'Cosmo' and 'Cosmopolitan' and key words." Id. at ¶ 10. As discussed

17 above, in 2014, I was able to secure from Crestridge the entirety of Mr. Obenstine's

18 email account. Amazingly, that production included the referenced "smoking gun

19 email" while the prior ones (which, according to Mr. Jafary's email, were compiled

20 using search terms that appear several times in the "smoking gun" email) did not.

21         6.      Although Plaintiffs had compelling evidence Mr. Obenstine did not

22 recruit Mr. Estakhrian by a "capper," and that Mr. Estakhrian perjured himself in

23 this regard at deposition, Plaintiffs persisted with this theory for years, abandoning it

24 when the class certification briefs were filed months ago. Thus, Mr. Obenstine

25 incurred extraordinary fees defending a meritless claim for nearly years.

26         7.      Plaintiffs also suggest I must have acted improperly in adopting the

27 view jurisdictional discovery would be limited to specific limited jurisdiction. It is

28 clear, however, that Judge Feess' original Order clearly stated there was no basis for

1  general jurisdiction, and that Estakhrian failed to put forth enough evidence to carry

2  his burden of proof regarding general jurisdiction. A reading of the Court's Order

3  (Doc. No. 46), a true and correct copy of which is attached as Exhibit "D," confirms

4  it was more than reasonable to interpret the Court's ruling to mean the Court

5  identified the only potential basis for jurisdiction (and, by extension, jurisdictional

6  discovery) was specific limited jurisdiction. Under section B.1.a. of the Order,

7  which discussed general jurisdiction with respect to the claims against Mr.

8  Obenstine, Judge Fess concluded:

9
10          Although Plaintiff endeavors to prove that Obenstine's
            contacts with California are ongoing, continuous, and
11          systematic, Plaintiff fails to establish that this Court can
            exercise general jurisdiction over him.
12                                    ***
13          [o]ne contact with California is insufficient to authorize
            this Court to exercise general personal jurisdiction. One
14          contact is not "continuous and systematic," and therefore
            does not approximate physical presence in the state
15

16

17          Moreover, under the referenced "general jurisdiction" heading, the Court's

18  Order said nothing about allowing jurisdictional discovery. In contrast, under the

19  "specific jurisdiction heading (B.1.b.), the Court stated, "Plaintiff's showing is

20  sufficient to entitled him to limited jurisdictional discovery."

21          8.      Plaintiffs also contend, without supporting evidence, that I made "false

22  promises and delays" concerning written discovery, but it is unclear precisely what

23  is being referred to. Concerning interrogatory number 7, I had discussions with

24  Plaintiffs' attorney Karla Gilbride, and asked that she re-serve the seven separate

25  questions comprising the interrogatory such that they were broken down into

26  separate requests because interrogatory number 7 violated the Federal Rules. This

27  request was never complied with.

28

OPPOSITION TO MOTION FOR SANCTIONS PURSUANT § 1927

9.      Plaintiffs further, and incorrectly, complain that, on July 25, 2015, I "falsely" stated that the Court ordered that private financial information be redacted from a transcript of Mr. Obenstine. Plaintiffs neglect to mention that in her rulings concerning the Crestridge production, Magistrate Judge Woehrle had imposed limitations on the discovery of private financial information. Regardless, there is no dispute that once I received the transcript, I promptly reviewed it and, ***within three hours' time***, confirmed "***I have now read the transcript and have no objection***."

10.      During the course of this litigation, I took the position discovery was stayed. This was in accordance with the plain language of California Civil Code section 425.16, which expressly states the pendency of an anti-SLAPP motion stays discovery. The stay was required to control mounting litigation costs, as my client had waited years to have the Motion heard. There was no "nefarious" intent behind the simply request that the Court honor the language of the anti-SLAPP statute. Rather, I sought to protect my client's interests and limit mounting litigation costs and encourage a prompt ruling on a dispositive, well-grounded motion that was never ruled upon.

I declare, under penalty of perjury under the laws of the State of California, that the foregoing is true and correct, and that this declaration was executed on July 22, 2016.

/s/   Harry A. Safarian
Harry A. Safarian

**Exhibit "A"**

| From: | Reza Jafary |
|---|---|
| To: | Mark Obenstine |
| Subject: | Re: Cosmo New Client |
| Date: | Tuesday, March 3, 2009 12:13:18 AM |

Ok

Best Regards,

Reza Jafary
Crestridge Partners INC.
Structured Finance
Cell: (949)278-4114
Fax: (949)271-4192
==============================
The above e-mail is for intended recipient user and it may contain confidential and privileged
information. If you are not the intended recipient of this e-mail, please delete this e-mail in its
entirety.

---

**From**: "Mark Obenstine"
**Date**: Mon, 2 Mar 2009 16:06:03 -0800
**To**: 'Reza Jafary'<reza@crestpar.com>
**Subject**: RE: Cosmo New Client

Reza,

Feel free to forward the Cosmopolitan materials delivered to you this morning to Mr. Estakhrian.  Thank you for
your kind assistance.

Best Regards,

Mark R. Obenstine, Esq.

---

**From:** Reza Jafary [mailto:reza@crestpar.com]
**Sent:** Thursday, February 26, 2009 9:34 AM
**To:** Mark Obenstine
**Subject:** Cosmo New Client

Mark,

I spoke to "James Estakhrian" today and he wants to Join the Cosmo Class Action lawsuit.
Please send me an engagement letter for his name also and I believe his e-mail is
estak1@hotmail.com However, I am not so sure about that but I will verify his e-mail today
by end of the day.

H also wants the same deal as Houshang Karimi (the guy we spoke yesterday).

Best Regards,

Reza Jafary
Structured Finance/Managing Partner
HTTP://WWW.CRESTRIDGEPARTNERS.COM
C: 949.278.4114

F: 949.271.4192
==========================================================

By providing your e-mail address, you are consenting to receive e-mail communications
promoting our products, pricing, and services as well as providing transactional information
necessary for your business. Although this e-mail and any attachment are believed to be free
of any virus or other defects that might affect any computer system into which it is received
and opened, it is the sole responsibility of the recipient to ensure that it is virus free and no
responsibility is accepted by Crestridge partners Corporation for any loss or damage arising in
any way from its use. If you do not wish to receive these e-mails communications, please e-
mail us at OPTOUT@CRESTPAR.COM with subject heading "ATTN: E-Mail OPT OUT".
Please be sure to include your email address that you wish to OPT OUT.

**Exhibit "B"**

**Page 219**

```
1         UNITED STATES DISTRICT COURT
2         CENTRAL DISTRICT OF CALIFORNIA
3
4  JAMES ESTAKHRIAN, on behalf    )
   of himself and all others     )
5  similarly situated,           )
                                 )
6         Plaintiff,             )
                                 )
7      vs                        )Case No.:
                                 ) CV11-3480 FMO (CWX)
8  MARK OBENSTINE, BENJAMIN F.   )
   EASTERLIN IV, KING & SPALDING,) Volume II -
9  LLP,                          )   Pages 219 - 418
                                 )
10                               )(Pursuant to agreement by counsel, this
          Defendants.            )transcript is deemed to contain
11 _____       )CONFIDENTIAL matters and is restricted to
                                  attorneys' eyes only and others acting in a
12                                                     capacity under their direction and/or employ.
13
14    Deposition of MARK RICHARD OBENSTINE,
      a Defendant herein, taken on behalf of
15    the Plaintiff, at 9:45 a.m., Friday,
      September 18, 2015, at 780 Roosevelt,
16    Irvine, California, before Mary E. Pierce,
      CSR 6143, a Deposition Officer.
17
18
19
20
21
22
23
24 MARY E. PIERCE, CSR 6143
25 15-146
```

**Page 220**

```
1
2  APPEARANCES OF COUNSEL:
3
4  For the Plaintiff:
5      MEHRI & SKALET PLLC
       By:  STEVEN A. SKALET
6      (Not present at deposition)
       1250 Connecticut Avenue, NW
7      Suite 300
       Washington, DC  20036
8       - and -
       FAY LAW GROUP PLLC
9      By:  RAYMOND C. FAY (Pro Hac Vice)
       1250 Connecticut Avenue NW
10     Suite 200
       Washington, DC  20036
11      - and -
       IRVINE LAW GROUP
12     By:  S. RON ALIKANI
       780 Roosevelt
13     Irvine, CA  92618
        - and -
14     CHAVEZ & GERTLER LLP
       (Not present at deposition)
15     42 Miller Avenue
       Mill Valley, CA  94941
16
17
18
19 For Defendant Mark Obenstine:
20     SAFARIAN BAROIAN, LLP
       By:  HARRY A. SAFARIAN
21     1000 N. Central Avenue
       Suite 210
22     Glendale, CA  91202
23
24
25
```

**Page 221**

```
1
2  APPEARANCES OF COUNSEL:  (cont.)
3
4  For Defendants King & Spalding, Benjamin F. Easterlin,
   IV:
5
       MUNGER TOLLES & OLSON, LLP
6      By:  STUART N. SENATOR
       355 S. Grand Avenue
7      35th Floor
       Los Angeles, CA  90071-1560
8
9
10
11
12 Videographer:
13     GARY WADE, Wade Enterprises
       (714) 634-8211
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 222**

```
1
2              I N D E X
3  WITNESS                          EXAMINATION
4  MARK RICHARD OBENSTINE (cont.)
5              (By Mr. Fay)              226
6
7  EXHIBITS - PLAINTIFF'S        FOR IDENTIFICATION
8   236   Email chain between Mark Obenstine and    279
          Donna Billiter dated August 19, 2009,
9         1 page
10  237   Emails from Kay Jackson dated August 20   282
          and August 28, 2009, 2 pages
11
12  238   Email chain between Kay Jackson and       318
          Mark Obenstine dated April 2009, 1 page
13  239   Email chain between Ben Easterlin, Dan    321
          Minella and Mark Obenstine dated
14        December 2009, 3 pages
15  240   Email from Ben Easterlin to Mark          325
          Obenstine dated May 10, 2010, 1 page
16
17  241   Email chain between multiple parties      330
          from January 2010 re:  Cosmo East,
18        2 pages
19  242   Email chain between Kay Jackson, Mark     333
          Obenstine and Nick Crosby dated
20        September 2009 re:  Cosmopolitan
          clients, 1 page
21  243   Email chain between Mark Obenstine and    335
          Kay Jackson dated November 2009 re:
22        Cosmopolitan:  Proposed content for
          Email Message, 2 pages
23
24  244   Email chain between Mark Obenstine,       338
          Sonny and Kay Jackson dated November
25        2009 re: Cosmopoiltan:  Proposed Content
          for Email Message, 3 pages
```

JAMES ESTAKHRIAN vs MARK OBENSTINE                                    Attorneys Eyes Only
OBENSTINE, MARK  on 09/18/2015

Page 383

```
1   had a legitimate shot.
2           And also, so I thought it was not
3   necessarily a longshot, but it was a difficult argument
4   to make, and I had to be very persuasive since we're
5   dealing with Nevada, which I consider to be a
6   pro-development environment.
7           And it was also about this time in late
8   2010 or -- where I received a call from Daniel Park
9   regarding what he thought were a cover-up regarding the
10  Cosmopolitan and the intention not to build.  So it
11  sort of shifted my focus to perhaps a more viable claim
12  that wasn't nearly as long of a longshot.
13      Q.   With regard to intention not to build, was
14  there any suit filed other -- that you know of other
15  than the ones that you were involved in?
16      A.   No.  I don't think so.
17  MR. SAFARIAN:  By anyone or by --
18  MR. FAY:  By anyone.
19  THE WITNESS:  I don't believe anyone else filed
20  a claim based on that theory.  The only attorney that
21  I'm -- I think espoused that theory, at least for a
22  period of time, was Daniel Park, and he reached out to
23  me.
24      Q.   BY MR. FAY:  What were the -- I'm sorry.
25  What I'm trying to get at is -- ask you
```

Page 384

```
1   this:  How many clients were signed up in connection
2   with the Williamson case?
3       A.   I'm sorry.  I have no memory.  I would
4   have to look at my files.  Probably at least a hundred,
5   I'd say.
6       Q.   Were those clients -- well, let me ask you
7   this:  What percentage of those clients were drawn from
8   your clients in the Watt case?
9       A.   Could you please define "drawn"?
10      Q.   Well, which were same people, I'm saying.
11      A.   Yeah.  Well, I think -- I guess almost by
12  necessity, would have to be the same people.
13      Q.   Well, I mean, I'm asking you to give me a
14  response concerning those that were your clients that
15  signed retainers, et cetera, as opposed to just an
16  absent class member.
17      A.   Yeah, I think a majority of them were
18  people who had a relationship with me and I guess felt
19  comfortable relying on my advice and consultation.
20      Q.   So I'm going to ask you the same question
21  with regard to Spangler.
22      A.   Spangler I would say was an outgrowth of
23  my determination to try to do something to help my
24  clients because once we were summarily dismissed in
25  Nevada and Judge Gonzalez, who had authority over the
```

Page 385

```
1   enforcement of the settlement agreement, refused to
2   even entertain our claims, I felt as though that our
3   only recourse was to seek redress in a California
4   court.
5           So I didn't go out and build a separate
6   group for the Spangler action.  I sort of just
7   basically said, okay, I will -- I feel like we've lost,
8   we have to go into California, so I'll represent you in
9   that forum.
10      Q.   Okay.  So with the exception of -- I
11  shouldn't say that.
12          How much overlap was there between the
13  group that you had started with in the Williamson case
14  and carried over to the Spangler case?
15      A.   I would say that the Williamson case --
16  and I'm just speaking hypothetically here -- if I had a
17  hundred clients, I would say that it's a safe bet that
18  maybe 50 of those clients were California residents.
19          So then I would -- I didn't feel that I
20  could offer up any guarantees regarding my ability to
21  protect the interests of non-California residents in
22  that action, so the overlap would not have been
23  one-to-one.  It would have been a lesser amount.
24      Q.   But it's still from the original core of
25  clients that you had represented -- excuse me --
```

Page 386

```
1   Mr. Coffing had represented in the Watt case; right?
2       A.   Yes, generally.
3       Q.   Okay.
4   MR. FAY:  This is Exhibit 254.  Let's go to
5   pink.
6   MR. SAFARIAN:  Suits you.
7   MR. FAY:  Thank you.
8   MR. SAFARIAN:  Just an attempt at humor.
9   MR. FAY:  Today it's a compliment.
10          (The document referred to was marked as
11  Plaintiff's Exhibit 254 for identification by
12  the Deposition Officer and is annexed hereto.)
13  MR. FAY:  254.  254.
14  MR. SAFARIAN:  Thank you.
15  MR. FAY:  254.
16      Q.   BY MR. FAY:  Exhibit 254 is an email from
17  Mr. Obenstine to Mr. Varma, copying Kay Jackson,
18  concerning the Cosmopolitan where Mr. Obenstine says,
19  "As discussed" -- "Sonny, as discussed, I'm going to
20  suspend engagement efforts on Phase Two until Phase One
21  for the East Tower is complete."
22          So Phase Two is essentially the claims
23  that became the Williamson case; right?
24      A.   No.  It's the claims of tort of another
25  doctrine.  It was the intent to file an action against
```

JAMES ESTAKHRIAN vs MARK OBENSTINE                              Attorneys Eyes Only
OBENSTINE, MARK  on 09/18/2015

Page 387

1  the attorneys responsible for drafting the Deutsche
2  Bank contract.
3       Q.    That's just not true, is it,
4  Mr. Obenstine?
5       MR. SAFARIAN:  Objection.  Argumentative.
6       Q.    BY MR. FAY:  Well, I'll argue with you
7  because that's just not true; is it?
8       A.    It is true.  I don't know why you would
9  think that I would even consider sending out engagement
10  letters that almost out of necessity flow back to
11  east tower clients talking to them about how Deutsche
12  Bank's not gonna build the units; meanwhile, I'm hoping
13  that east tower clients will accept a settlement deal
14  under your theory.
15            So I'm putting the east tower deal, which
16  is close to complete, in jeopardy by arguing that don't
17  -- you should take the settlement, but at the same time
18  I don't think they're gonna build.  I think that would
19  be absurd.
20            So the only interpretation that I think
21  makes sense is that I was looking to proceed on an
22  entirely separate legal theory that had nothing to do
23  with the settlement agreement itself.
24       Q.    I'm going to accept your absurd
25  explanation, and we'll move on.

Page 388

1       MR. SAFARIAN:  There's no need for that.
2  There's really no need for that.
3       MR. FAY:  No need for him to call me absurd.
4  There just isn't any need for it.
5       MR. SAFARIAN:  Just go on to your next question.
6       THE WITNESS:  I apologize.  I was referring to
7  the --
8       MR. FAY:  Okay.
9       THE WITNESS:  -- the interpretation.
10       MR. FAY:  Exhibit 255 is dated March 4, 2010.
11  It's an email from Mr. Obenstine to Mr. Varma, copy to
12  Miss Kay Jackson, dated March 4th, 2010.  The text of
13  it says, "Sonny, just curious as to how Cosmopolitan
14  Phase Two is coming.  Any indication that purchasers
15  are seeking to join the Daniel Park action?  Do you
16  think that we can still wait until March 29th to
17  disseminate client retention materials?"
18            (The document referred to was marked as
19            Plaintiff's Exhibit 255 for identification by
20            the Deposition Officer and is annexed hereto.)
21       Q.    BY MR. FAY:  Now, you earlier described
22  the Daniel Park bulletin to you, which you said was
23  late 2010, about no intention to build.
24            I'm sorry.  What did you call it?  You
25  called it something else.  What was it?  You said --

Page 389

1  you described Park's theory that he had given to you as
2  what, no intention to build?  Was that what you called
3  it?
4       A.    I believe so, yes.
5       Q.    So no intention to build condos is what
6  you're talking about; right?  Is that right?
7       A.    Right.
8       Q.    Okay.  So, in fact, Mr. Park was trying to
9  get something together on that score in early 2010,
10  wasn't he?
11       A.    I don't know if this is -- it's been a
12  while -- if this is referencing, Mr. Park filed an
13  action to -- on behalf of people who opted out --
14       Q.    Okay.
15       A.    -- of the settlement agreement.
16            So I don't think he would have any claim
17  against Deutsche Bank if his clients had not accepted
18  the settlement agreement on a no intention to build.
19            So I believe this is in reference to the
20  action he had been prosecuting for the clients who
21  opted out of the settlement agreement.
22       Q.    All right.  And again, "Cosmopolitan Phase
23  Two" refers to the claims that ended up in the
24  Williamson case; right?
25       A.    I'm sorry.  Repeat that question?

Page 390

1       Q.    "Cosmopolitan Phase Two" in this email
2  refers to the claims of the type that were brought in
3  Williamson, doesn't it?
4       A.    No, it does not.  As I previously
5  testified, I don't know why you would think I would
6  pursue --
7       MR. SAFARIAN:  Just answer his question, please.
8       THE WITNESS:  I was not -- okay.  I was not
9  seeking to communicate to prospective clients that
10  Deutsche Bank had no intention to build units while at
11  the same time trying to convince clients to accept the
12  east tower settlement in which it was understood that
13  Deutsche Bank was fully prepared to move forward with
14  the purchase contracts and build the units.
15       Q.    BY MR. FAY:  What is Project Optimus?
16       A.    I believe that was the colorful term that
17  Sonny would use to describe our subsequent Cosmopolitan
18  action.
19       MR. FAY:  All right.  Exhibit 256.  Yeah, 256 is
20  an email from Rajiv Uppal to Mark Obenstine.
21            (The document referred to was marked as
22            Plaintiff's Exhibit 256 for identification by
23            the Deposition Officer and is annexed hereto.)
24       Q.    BY MR. FAY:  So this is dated April 28th,
25  2010, and did you receive this email around April 28th,

JAMES ESTAKHRIAN vs MARK OBENSTINE                                    Attorneys Eyes Only
OBENSTINE, MARK  on 09/18/2015

Page 391

1  2010, from Rajiv Uppal?
2     A.  I don't remember receiving it, but it
3  looks like I did, yes.
4     Q.  It looks like the context -- from the
5  context of this that Mr. Uppal was a client of yours in
6  the Trump matter; is that right?
7     A.  Yes.
8     Q.  And down at the bottom, Mr. Varma's
9  sending him some materials, including a confidentiality
10 agreement and an engagement letter, along with Kay's
11 fax number, asking to send $1500 per contract made out
12 to Mark Obenstine, Obenstine, Esquire.
13        Was the retainer taken in the Williamson
14 case $1,500 per?
15    A.  I don't remember.
16    Q.  It says, "Per our discussion, please
17 remember we are in stealth mode."
18        What did that refer to?
19    MR. SAFARIAN:  Objection.  Lacks foundation,
20 calls for speculation.
21    THE WITNESS:  It appears I was concerned about
22 what I considered to be pretty compelling legal
23 theories based upon confidential discovery proceedings
24 in the Trump Tower arbitration to be of value, and I
25 was concerned about communicating to anyone that was an

Page 392

1  attorney in the Las Vegas community that I had this
2  legal theory for fear that they would parasitcally work
3  off of it and file an action, as well.
4     Q.  BY MR. FAY:  Wasn't the real concern that
5  you had the scenario that you described a few minutes
6  ago as absurd, that is, that you were in stealth mode
7  because you were preparing an action, second action,
8  that was antithetical to the release in the matter that
9  wasn't even completed with regard to the east tower?
10    A.  That's not true.  I would never place any
11 confidence in a confidentiality agreement to prevent
12 someone who was, let's say, a west tower purchaser who
13 had a friend who was about to accept an east tower
14 settlement.
15        I don't think that a confidentiality
16 agreement would stop them from communicating to their
17 friends and family who owned units in the east tower.
18 And I -- not only that, but a lot of the west tower
19 purchasers also owned units in the east tower.
20        So I don't put a lot of stock in
21 confidentiality agreements to prevent people from doing
22 what's morally correct.
23    Q.  It sounds like that's a matter that you
24 discussed with your colleagues, including Varma and
25 Billiter, regarding the timing of issuing the

Page 393

1  engagement letters.  Is that what happened?  In other words,
2        Is that what happened?  In other words,
3  what you just described about, you know, the leaking
4  sieve, was that something that you discussed with your
5  colleagues that drove the timing of the issuance of the
6  engagement letters and the confidentiality agreement?
7     A.  The -- there was no discussion whatsoever
8  because there was no intention to file an action
9  predicated on the legal theory that they had no
10 intention to build.
11        I had no knowledge of what Deutsche Bank
12 intended to do or not do and was proceeding under an
13 entirely separate legal theory, as communicated in the
14 engagement letter that I sent out.
15        The cover letter specifically said we are
16 not proceeding under the theory that Deutsche Bank is
17 not going to build; we are proceeding under an entirely
18 separate theory.
19        I wanted to make certain my clients were
20 not confused by my intentions.
21    MR. FAY:  Okay.  That was number 256.
22        Exhibit 257 is an email from you to Varma
23 and Billiter enclosing Cosmopolitan engagement
24 materials on April 12th, 2010.  And we don't have those
25 with this document, but they're identified by the

Page 394

1  document descriptions of "confidentiality agreement,"
2  "engagement agreement," "Ben Easterlin bio."
3        And you say, "Sonny and Kay, attached are
4  the proposed Cosmopolitan engagement materials.  Feel
5  free to offer commentary.  Please do not distribute.  I
6  would like to wait until funds from the east tower are
7  fully distributed."
8        (The document referred to was marked as
9        Plaintiff's Exhibit 257 for identification by
10       the Deposition Officer and is annexed hereto.)
11    Q.  BY MR. FAY:  So did you send that email to
12 Varma and Billiter on or about April 12th, 2010?
13    A.  I believe so.
14    MR. FAY:  Exhibit 258 -- I'm going to put the
15 pink thing on there.  Give it to him.  It's a document
16 dated April 26, 2010, entitled "Confidentiality
17 Agreement" to the unit purchaser of the Cosmopolitan
18 Resort Casino from Mark Obenstine, Esquire.
19        (The document referred to was marked as
20       Plaintiff's Exhibit 258 for identification by
21       the Deposition Officer and is annexed hereto.)
22    THE WITNESS:  Okay.
23    Q.  BY MR. FAY:  So this is a confidentiality
24 agreement that you sent out to people that you wanted
25 to retain you to bring a subsequent action against

JAMES ESTAKHRIAN vs MARK OBENSTINE                                    Attorneys Eyes Only
OBENSTINE, MARK  on 09/18/2015

---

Page 395

1  Deutsche Bank; right?

2      A.    Against the attorneys for Deutsche Bank.

3      Q.    Where does it say that in this document?
4  Where's the reference to the attorneys for Deutsche
5  Bank?

6      A.    I think it's implied pretty directly with
7  the last sentence of the second paragraph.  I'm sorry.
8  The second -- the penultimate sentence of the second
9  paragraph.

10     Q.    It says, "Our legal action will be focused
11 on the intentional misconduct and fraudulent
12 concealment that occurred shortly after most purchasers
13 executed their purchase contracts."

14           Is that what you're relying on?

15     A.    Yes.  That relates to what I consider to
16 be an intentional fraudulent concealment by the
17 attorneys from Snell & Wilmer to --

18     Q.    I thought --

19     A.    -- conceal the rights.

20     Q.    I thought you had told us that the -- that
21 the offenses were in connection with the creation of
22 the documents, not something that was done after the
23 documents were created.

24     A.    Well, they're interconnected in the sense
25 that under the federal statute, you had to incorporate

---

Page 396

1  certain protections into the original contract.
2  Otherwise, provide a clearly stated right of
3  revocation.

4           They failed to incorporate the
5  protections, as well as the right of revocation.  Then
6  they went back and tried to have purchasers sign an
7  addendum agreeing that the protections that they failed
8  to put in the first place would now be inserted into
9  the contract.

10          Doing so is a violation.  You have to
11 clearly enunciate that you failed to provide the
12 protections and, therefore, they have a right of
13 revocation.

14     Q.    What was the federal statute that you're
15 referring to?

16     A.    The Interstate Land Sales Full Disclosure
17 Act.

18     Q.    And that was the subject of the claims in
19 the Williamson case; right?

20     A.    That was the subject of my second action
21 against the Cosmopolitan that I was contemplating at
22 this period of time.

23     Q.    I'm asking you about the Williamson case,
24 sir.

25     A.    The Williamson case was predicated upon a

---

Page 397

1  belief that Mr. Daniel Park had communicated to me that
2  they had no intention to build.

3      Q.    Counts five and six of the Williamson case
4  were based on violations of the Interstate Land Sales
5  Full Disclosure Act; correct?

6      A.    I'd have to see a copy of the complaint.
7  It's been a long time.

8      Q.    Sure.  Go ahead.

9      A.    Okay.

10          MR. SAFARIAN:  Ray, when you're at a good
11 stopping point, I want to either use the restroom or if
12 we're almost done, let me know and I can hold tight.

13          MR. FAY:  Why don't you --

14          MR. SAFARIAN:  What's that?

15          MR. FAY:  Let's go off the record.

16          Use the restroom, and then I'll go talk to
17 Mr. Alikani.

18          THE VIDEOGRAPHER:  We're going off the video
19 record.  Time is approximately 3:21 p.m.

20          (Brief recess.)

21          THE VIDEOGRAPHER:  We are back on the video
22 record.  Time is approximately 3:33 p.m.

23     Q.    BY MR. FAY:  So Mr. Obenstine, you're
24 holding the Williamson complaint in your hand, and I
25 had alerted you to the two counts dealing with the

---

Page 398

1  Interstate Land Sales Disclosure Act, and my question
2  to you was whether the -- forget what my question was,
3  but I asked you to look at those claims and confirm
4  that those claims were in the Williamson complaint.

5      A.    I don't believe that they are because the
6  cause of action that you reference, the fourth and
7  fifth cause of action, do not relate to any type of
8  concealment regarding federal protections.  They relate
9  to a property report that represented that the
10 development would be completed by January 2009.

11          And it seems to be -- the fifth cause of
12 action seems to be more generalized in its approach
13 that it failed to inform buyers of the decrease in
14 condominium units, failed to inform buyers that they
15 would no longer have access to amenities exclusively
16 for condominium owners and failed to update the
17 property report.

18          So it seems that this case is predicating
19 the Interstate Land Sales Full Disclosure Act
20 violations on the property report and not on the
21 purchase contract.

22     Q.    Okay.  So can I have that back, please?
23 Thank you.

24          I asked you the questions because you had
25 referred to the federal statute, but count one of this

---

PANTERA COURT REPORTERS                          panterareporters@msn.com
714-964-6200                                       Pages 395..398

**Exhibit "C"**

1  S. RON ALIKANI, ESQ. (SBN 206939)
   E-mail: ralikani@irvinelawgroup.com
2  IRVINE LAW GROUP, LLP
3  7700 Irvine Center Dr., Suite 800
   Irvine, CA 92618
4  Telephone: 949-653-6153
5  Facsimile: 949-653-1277
   *Attorneys for Plaintiff and Proposed Class*
6

7

8              UNITED STATES DISTRICT COURT

9             CENTRAL DISTRICT OF CALIFORNIA

10  JAMES ESTAKHRIAN, on          Case No. CV11-3480 GAF (CWX)
11  behalf of himself and all others
                                   Assigned to Hon. Gary A. Feess;
12  similarly situated,            Discovery Motions Assigned to
                                   Magistrate Judge Carla Woehrle
13

14              Plaintiffs,

15                                 **DECLARATION OF REZA JAFARY**
                                   **REGARDING (1) PLAINTIFF'S**
16       v.                        **MOTION TO RESOLVE CLAIMS OF**
                                   **ATTORNEY-CLIENT PRIVILEGE**
17  MARK OBENSTINE,               **UNDER FED. R. CIV.P.**
    BENJAMIN F. EASTERLIN          **45(d)(2)(B)**
18  IV, TERRY A. COFFING,          **AND (2) DEFENDANT OBENSTINE'S**
    King & Spalding, LLP, and      **MOTION FOR PROTECTIVE ORDER**
19  MARQUIS & AURBACH,             **AND FOR SANCTIONS**
20  P.C.,
                                   **Date: January 17, 2012 (Motion 1)**
21                                 **Time: 10:00 a.m.**
22              Defendants.        **Judge: Hon. Carla Woehrle**

23                                 **Date: January 24, 2012 (Motion 2)**
24                                 **Time: 10:00 a.m.**
25                                 **Judge: Hon. Carla Woehrle**

26

27  I, Reza Jafary, declare and state as follows:
28

                                  1
DECLARATION OF REZA JAFARY REGARDING ( 1) PLAINTIFF'S MOTION TO RESOLVE CLAIMS OF
PRIVILEGE AND (2) DEFENDANT OBENSTINE'S MOTION FOR PROTECTIVE ORDER

1.     I am the managing partner and president of Crestridge Partners, Inc.  Mr.
Rene Bayani is also a managing Partner and vice President of Crestridge
Partners, a commercial real estate finance and advisory company based in city
of Irvine, CA.  I am over 18 years old, and if called to testify to the matters
stated herein I am competent to so testify.

2.     Crestridge Partners, Inc. was founded in August 4, 2008 as a corporation
with election of S-corporation filing from Internal Revenue Service. I formed
the corporation by using the online services of Legalzoom.com.  When I formed
the company I took a 50% ownership share and my partner Rene Bayani took
the remaining 50% ownership share.  The ownership shares have remained the
same since the formation of the company.  The corporate documents of
Crestridge have never been changed to add any additional ownership besides
myself and Mr. Bayani. In addition, we own the domain names
www.crestpar.com and www.crestridgepartners.com.

3.     Mark Obenstine became involved with Crestridge Partners in early August
2008.  The intention was that Mr. Obenstine would serve as general counsel for
Crestridge Partners because of his legal background.  Mr. Obenstine asked to join
Crestridge Partners as a partner.  Mr. Bayani and I gave him corporate paperwork
in December 2008 to issue shares to himself and two other members and to join
Crestridge Partners.  After holding the papers for eight (8) months, he returned the
corporate paperwork without any modifications and revisions or any signature to
any of the original documents. Mr. Obenstine's involvement with the business of
Crestridge Partners turned out to be very minimal.  My understanding is that he
used his Crestridge office space and e-mail account primarily if not exclusively for
his litigation on behalf of real estate purchasers in various cases in Las Vegas.

4.     Mr. Obenstine never invested any money in Crestridge Partners and,
except for one small check he received in December 2008, he did not receive

2

**DECLARATION OF REZA JAFARY REGARDING ( 1) PLAINTIFF'S MOTION TO RESOLVE CLAIMS OF PRIVILEGE AND (2) DEFENDANT OBENSTINE'S MOTION FOR PROTECTIVE ORDER**

any payments from Crestridge Partners. Mr. Obenstine did not pay for any use of office space at Crestridge Partners or any other expenses of the business, except that during a 12-month period Mr. Obenstine requested, and paid for, a separate executive office suite for himself in Los Angeles, a location outside of Crestridge Partners' office in Orange County. Mr. Obenstine did not pay for use of a crestpar.com e-mail account and its services or for any security measures associated with that account.

5.     It was company policy that all crestpar.com e-mail accounts were password-protected. Crestridge maintained a cloud backup of all e-mails and these backups have been accessible to me without requiring passwords. Mr. Obenstine was well aware of the Crestridge backups because he took advantage of them on multiple occasions when he asked us to recover e-mails after he experienced crashes of his personal computer.

6.     I served as an administrator on Mr. Obenstine's Crestridge e-mail account, which meant that I had access to the content of his e-mails through our backup systems. I used my role as an administrator to assist Mr. Obenstine in recovering e-mails that he had lost, and he was aware of the access that I had to his e-mails stored on the Crestridge server. Mr. Bayani and I both had access to all e-mail accounts as an administrator of our e-mail accounts.

7.     At no time during his association with Crestridge Partners did Mr. Obenstine ever tell me or Mr. Bayani that his e-mails should be segregated, purged, or subjected to a higher level of security because he was using his crestpar.com account to communicate with clients in his litigation practice. Mr. Obenstine's e-mails on the Crestridge server were treated no differently than those of anyone else with a crestpar.com e-mail account.

8.     In week of June 20, 2010 Mr. Obenstine and I reached a tentative agreement that he would end his association with Crestridge Partners, but he

DECLARATION OF REZA JAFARY REGARDING ( 1) PLAINTIFF'S MOTION TO RESOLVE CLAIMS OF PRIVILEGE AND (2) DEFENDANT OBENSTINE'S MOTION FOR PROTECTIVE ORDER

1 asked to continue using his crestpar.com e-mail address for a few additional
2 weeks. In early October 2010, I noticed that a large volume of e-mails were
3 still being sent and received from the mark@crestpar.com address. I asked Mr.
4 Obenstine why he was still using Crestridge's e-mail server. He responded that
5 it was convenient for him to continue using the address and offered to pay to
6 retain his access. I declined his offer and said that because he was no longer
7 involved with our company, he should not be using one of our e-mail accounts.
8 He also informed me, in an e-mail conversation in early October, that he had
9 informed all his clients that he had left Crestridge Partners a long time ago. Mr.
10 Obenstine did not define exactly what he meant by long time ago. After several
11 more discussions along these lines, I removed Mr. Obenstine's access to his
12 crestpar.com e-mail account on November 10, 2010.
13 9.     During my discussions with Mr. Obenstine about ending his use of the
14 crestpar.com e-mail system, he never asked for his existing e-mails on the
15 server to be purged or expressed concern about what would happen to them.
16 The entire focus of our conversations was on whether and for how long he
17 could continue using Crestridge's system for sending and receiving e-mail.
18 10.    In response to the subpoena that I received from counsel for James
19 Estakhrian on December 9, 2011, I conducted searches on Crestridge's server
20 for e-mails to or from the address mark@crestpar.com concerning the
21 Cosmopolitan litigation for "Cosmo" and "Cosmopolitan" and key words. I
22 then printed the resulting list of e-mails to various pdf documents. The total pdf
23 resulting from this search was over 3,000 pages in length, so I broke it into
24 several smaller documents. I e-mailed some of these documents to Plaintiff's
25 counsel on December 14, 2011 by providing links to the locations on
26 Crestridge's server where the pdf documents containing the e-mails could be
27 found. Crestridge intended to produce the remaining pdf documents sometime
28

**DECLARATION OF REZA JAFARY REGARDING ( 1) PLAINTIFF'S MOTION TO RESOLVE CLAIMS OF PRIVILEGE AND (2) DEFENDANT OBENSTINE'S MOTION FOR PROTECTIVE ORDER**

between December 14, 2011 and the deadline listed on the subpoena of December 23, 2011 as I was planning to visit Michigan for business purposes from December 18- December 21, 2011. But after Mr. Obenstine's attorney contacted my attorney, Brad Mokri, to express concerns that he had about the materials being privileged, Crestridge Partners did not produce any further documents to Plaintiff's counsel and deactivated the link to existing documents.

I declare under penalty of perjury that the foregoing is true and correct. Executed on January 9, 2012, at Irvine, California.

Reza Jafary

**DECLARATION OF REZA JAFARY REGARDING ( 1) PLAINTIFF'S MOTION TO RESOLVE CLAIMS OF PRIVILEGE AND (2) DEFENDANT OBENSTINE'S MOTION FOR PROTECTIVE ORDER**

**Exhibit "D"**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 11-03480 GAF (CWx) | Date | October 24, 2011 |
|---|---|---|---|
| Title | James Estakhrian v. Mark Obenstine et al | | |

| Present: The Honorable | **GARY ALLEN FEESS** | |
|---|---|---|
| Renee Fisher | None | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None | None |

**Proceedings:** **(In Chambers)**

## ORDER RE: MOTIONS TO DISMISS

### I.
### INTRODUCTION

The present suit arises out of a 2009 class action settlement that Defendants, various attorneys and law firms, negotiated to recover deposits placed on condominiums in the Cosmopolitan, a construction project on the Las Vegas strip, after its initial developer defaulted on its construction loan. Plaintiff alleges that his and other clients' participation in the settlement was obtained through fraudulent and unlawful means, and now seeks recovery from Defendants on behalf of himself and other settlement participants.

On August 24, 2011, Defendants Terry A. Coffing ("Coffing") and Marquis Auerbach Coffing, P.C. (the "MAC Firm") (collectively, the "MAC Defendants") filed a Motion to Dismiss for lack of personal jurisdiction or, in the alternative, for failure to state a claim as to Plaintiff's sixth claim for fraud. (Docket No. 24 [Mem. MAC].) On the same day, Defendant Mark Obenstine ("Obenstine") filed two motions: (1) a Motion to Dismiss for lack of personal jurisdiction or, in the alternative, for failure to state a claim; and (2) a Special Motion to Strike pursuant to California's "anti-SLAPP statute," Cal. Civ. Proc. Code section 425.16. (Docket No. 26 [Mem. Obenstine]; Docket No. 28.) Because the Court is unable to determine from the pleadings whether it may exercise personal jurisdiction over Defendants, the Court will delay determination of all motions until Plaintiff is able to engage in limited jurisdictional discovery. Plaintiff's request for jurisdictional discovery is therefore **GRANTED**.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 11-03480 GAF (CWx) | Date | October 24, 2011 |
|---|---|---|---|
| Title | James Estakhrian v. Mark Obenstine et al | | |

**II.**
**BACKGROUND**

During 2005 and 2006, Plaintiff James Estakhrian and the proposed class members collectively deposited approximately $250 million and signed agreements to purchase condominiums in the Cosmopolitan, a condominium-casino development undergoing construction in Las Vegas, Nevada. (Docket No. 1 [Compl.] ¶ 13.) The developer ultimately defaulted on its construction loan with Deutsche Bank, and in 2008, Deutsche Bank, through a wholly owned subsidiary, acquired the property and all obligations under the purchase agreements. (Id. ¶ 14.) In 2009, the project underwent significant design changes, and rumors circulated that the Cosmopolitan would be completed as a hotel. Indeed, when the Cosmopolitan opened in December 2010, the condominiums had all been converted into hotel rooms. (Id. ¶ 15.)

In late 2008, Defendants Obenstine, Benjamin F. Easterlin IV ("Easterlin"), and King & Spaulding, LLP ("King & Spaulding")—all of whom were then litigating a class action to recover deposits on condominium units in Las Vegas's Trump Tower (the "Trump action")—allegedly began soliciting clients for a similar class action involving the Cosmopolitan (the "Cosmopolitan action"). (Id. ¶ 16–17.) Separate settlements were entered for purchasers of the West and East Towers, after fairness hearings, in December 2009 and April 2010. Class members received amounts equal to approximately 60 percent of their escrow deposits. (Id. ¶ 31.) Some class members were refunded their $1,000 retainer deposits, less an unexplained $250 "administrative fee"; other class members received no refund of the retainer deposit. (Id. ¶¶ 34-35.)

Plaintiff now asserts a complex conspiracy, in which Defendants unlawfully used "cappers and runners" to solicit client involvement in the lawsuit and settlement, while simultaneously neglecting to disclose that one of the attorneys purported to be working on the case was not actually appearing in the litigation and was a partner at a law firm that simultaneously represented Deutsche Bank. (Id. ¶¶ 18–22.) Plaintiff avers that Defendants, especially Easterlin and King & Spaulding, knew and concealed the fact that the Cosmopolitan's owner planned to complete the project as a hotel-casino instead of as a condominium-casino—thereby entitling the class to full refunds of their deposits—and negotiated the settlement at an "unjust discounted sum" instead. (Id. ¶¶ 2–3.)

More specifically, Plaintiff alleges that a woman named "Kay Jackson" fraudulently held herself out as a class member; solicited Plaintiff and other condominium purchasers' involvement in the Cosmopolitan action; repeatedly updated the class via her website,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 11-03480 GAF (CWx) | Date | October 24, 2011 |
|---|---|---|---|
| Title | James Estakhrian v. Mark Obenstine et al | | |

"cosmopolitanownerslv.com"; vouched for Defendants as attorneys; disparaged competing attorneys; and vigorously encouraged the class to join the settlement. (Id. ¶¶ 3, 23–30.) Plaintiff avers that Jackson was actually Donna Billiter, a class action representative in the Trump action who had also solicited clients for Defendants in that action. Plaintiff bases this allegation on the facts that "Kay Jackson" and Donna Billiter held the same phone number, and that Jackson did not appear on the list of the Cosmopolitan's condominium purchasers. (Id. ¶¶ 27–28, 40.) Plaintiff claims that Jackson was actually Defendants' agent, serving as an unlawful "capper and runner" on their behalf. (Id. ¶ 3.)

Plaintiff states that Jackson told Plaintiff and the class members through her website that she had met with Easterlin and Obenstine at least once and that Easterlin and King & Spaulding were heading the litigation. (Id. ¶¶ 25–26, 29.) However, Defendants did not disclose to the court approving the Cosmopolitan settlement either (1) Easterlin and King & Spaulding's involvement in the case; or (2) King and Spaulding's conflict of interest through their concurrent representation of Deutsche Bank. (Id. ¶ 32.) Further, Easterlin and King & Spaulding were not mentioned in the retainer agreement that Plaintiff and other class members signed, nor did they formally appear in the case, although they allegedly did enter into undisclosed fee-sharing agreements with Defendants and did direct the litigation and settlement strategy. (Id. ¶ 20.)

On April 26, 2010, Obenstine solicited Plaintiff and others to enter into a new lawsuit, whereby they would recover the remaining balance of their escrow deposits plus punitive damages, under the theory that the defendants in the Cosmopolitan action had engaged in intentional misconduct and fraudulent concealment as to their ultimate plans for the condominiums, allowing the class to file suit in spite of the settlement. (Id. ¶¶ 36, 38.) Plaintiff alleges that Easterlin and King & Spaulding were involved in this new action to the same extent as in the settlement, and that Defendants filed this lawsuit having known the Cosmopolitan defendants' true intentions for the condominiums all along. (Id. ¶¶ 39, 41.)

**III.
DISCUSSION**

**A. LEGAL STANDARD GOVERNING A RULE 12(B)(2) MOTION TO DISMISS**

Under Federal Rule of Civil Procedure 12(b)(2), a defendant may move to dismiss a complaint for lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2). The plaintiff bears the burden to establish that a court has personal jurisdiction over the defendants. Mattel, Inc. v. Greiner & Hausser GmbH, 354 F.3d 857, 862 (9th Cir. 2003). "The court may consider evidence presented in affidavits to assist it in its determination and may order discovery on the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 11-03480 GAF (CWx) | | Date | October 24, 2011 |
|---|---|---|---|---|
| Title | James Estakhrian v. Mark Obenstine et al | | | |

jurisdictional issues." Doe v. Unocal Corp., 248 F.3d 915, 922 (9th Cir. 2001). However, if the district court decides a motion to dismiss "without holding an evidentiary hearing, the plaintiff need make only a prima facie showing of jurisdictional facts to withstand the motion to dismiss." Id. (internal quotations omitted). In other words, "the plaintiff need only demonstrate facts that if true would support jurisdiction over the defendant." Id. (internal quotations omitted). The Court must take the plaintiff's version of the facts as true unless they are "directly controverted." Id. "[C]onflicts between the facts contained in the parties' affidavits must be resolved in plaintiffs' favor for purposes of deciding whether a prima facie case for personal jurisdiction exists." Id. (internal quotations and alteration omitted). However, "conclusory statements are not enough to satisfy a prima facie showing of jurisdiction without supporting evidence contained in the record." Spacey v. Burgar, 207 F. Supp. 2d 1037, 1049 (C.D. Cal. 2001).

Because this Court sits in California and no federal law governs personal jurisdiction over this case, the Court must apply California's long-arm statute. See Panavision Int'l, L.P. v. Toeppen, 141 F.3d 1316, 1320 (9th Cir. 1998). "California's long-arm statute is co-extensive with federal standards, so a federal court may exercise personal jurisdiction if doing so comports with federal constitutional due process." Boschetto v. Hansing, 539 F.3d 1011, 1015 (9th Cir. 2008); see also Cal. Civ. Proc. Code § 410.10. Under federal due process standards, to exercise personal jurisdiction over a non-resident defendant, "that defendant must have at least 'minimum contacts' with the relevant forum such that the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 801 (9th Cir. 2004) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).

There are two types of personal jurisdiction: general and specific. Boschetto, 539 F.3d at 1016. A court may exercise general jurisdiction over a defendant only if the defendant "engage[s] in continuous and systematic general business contacts that approximate physical presence in the forum state." Schwarzenegger, 374 F.3d at 801 (internal citation and quotations omitted). "[A] finding of general jurisdiction permits a defendant to be haled into court in the forum state to answer for any of its activities anywhere in the world." Id. The court should consider, inter alia, the contacts' "[l]ongevity, continuity, volume, economic impact, physical presence, and integration into the state's regulatory or economic markets" in making this determination. Tuazon v. R.J. Reynolds Tobacco Co., 433 F.3d 1163, 1172 (9th Cir. 2006). Federal courts have been, throughout time, "reluctant to exercise general jurisdiction." Id.

Specific jurisdiction is more limited—it may only be established where the plaintiff's claims derive from the defendant's contacts with the forum state. Data Disc, Inc. v. Systems Technology Assocs. Inc., 557 F.2d 1280, 1287 (9th Cir. 1977). The Ninth Circuit employs a

LINK: 24, 26, 28

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 11-03480 GAF (CWx) | Date | October 24, 2011 |
|----------|------------------------|------|------------------|
| Title | James Estakhrian v. Mark Obenstine et al | | |

three-prong test to determine whether a court may exercise specific personal jurisdiction over a non-resident defendant:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;

> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and

> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

Schwarzenegger, 374 F.3d at 802 (emphasis added). The plaintiff bears the burden of satisfying the first two prongs. Id.. If the plaintiff succeeds, the burden then shifts to the defendant to "present a compelling case" that the exercise of jurisdiction would not be reasonable. Id. (citing Burger King v. Rudzewicz, 471 U.S. 462, 476-78 (1985))

**B. APPLICATION**

    **1. OBENSTINE**

        ***a. General jurisdiction***

        Although Plaintiff endeavors to prove that Obenstine's contacts with California are ongoing, continuous, and systematic, Plaintiff fails to establish that this Court can exercise general jurisdiction over him. Obenstine avers that, although he was once a California resident and maintained a California business address, he closed the office in 2009 and moved to Nevada with no intent to return to California. (Mem. Obenstine, Obenstine Decl. ¶¶ 2–3, 5.) Plaintiff attempts to cast doubt on this sworn statement by pointing to two complaints filed in California Superior Court in 2010, one by Obenstine and the other against him, that purportedly establish that Obenstine remained a California resident after 2009. (Docket No. 32 [Opp. Obenstine] at 5-7.) However, from the face of these complaints, the communications that occurred while Obenstine was a California resident and that gave rise to the complaints occurred prior to March 2009. (Docket No. 43 [Rep. Obenstine] at 5; see Docket No. 35 [Alikani Decl.], Exs. 1-2.) The complaints do not, therefore, cast doubt on Obenstine's declaration.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 11-03480 GAF (CWx) | Date | October 24, 2011 |
|---|---|---|---|
| Title | James Estakhrian v. Mark Obenstine et al | | |

Plaintiff also points to Obenstine's receipt via certified mail, on June 15, 2011, at an address in California of a notice of litigation. (Opp. Obenstine at 7; Alikani Decl., Ex. 9.) Obenstine counters that he traveled to California only after learning that he had received seemingly important correspondence from Plaintiff's counsel, and that he retrieved it at a post office. (Rep. Obenstine at 5; Rep. Obenstine, Supplemental Declaration of Mark Obenstine ¶ 2.) Plaintiff's production of a registered mail receipt signed by Obenstine does not, by itself, establish that Obenstine maintained a physical address in California. Even if it did, one contact with California is insufficient to authorize this Court to exercise general personal jurisdiction. One contact is not "continuous and systematic," and therefore does not approximate physical presence in the state.[1]

### b. Specific jurisdiction

Generally, the existence of an attorney-client relationship between a law firm in one state and a plaintiff in the forum state does not, in itself, constitute purposeful availment, even if the attorney travels to the forum state. Sher v. Johnson, 911 F.2d 1357, 1363 (9th Cir. 1990). However, one of the key determinations in Sher was the fact that the law firm did not solicit the client's business in California: the client solicited the law firm. Id. at 1362. Here, Plaintiff argues that Sher does not apply because Plaintiff's involvement in the Cosmopolitan action was solicited by Obenstine through an agent—namely, Kay Jackson.

For the purposes of personal jurisdiction, the actions of an agent are imputed to the principal. Id.; Myers v. Bennett Law Offices, 238 F.3d 1068, 1073 (9th Cir. 2001). "An agent is one who represents another, called the principal, in dealings with third persons." CAL. CIV. CODE § 2295. An agency relationship can be established for the purposes of personal jurisdiction where the plaintiff makes a prima facie showing that the agent had actual or apparent authority, or that the principal ratified the agent's conduct. Myers, 238 F.3d at 1073. To establish an agency relationship by ratification, the principal must have knowledge of the agent's activities. RESTATEMENT (THIRD) AGENCY § 4.01 cmt. b (2006) ("The principal is not bound by a ratification made without knowledge of material facts about the agent's act unless the principal chose to ratify with awareness that such knowledge was lacking."); see also Besser v. Chapple,

---

[1] Both parties appear to conflate the doctrine of general jurisdiction with a separate but related basis for personal jurisdiction: the defendant's state of domicile. See, e.g., Milliken v. Meyer, 311 U.S. 457, 462 (1940) ("Domicile in the state is alone sufficient to bring an absent defendant within the reach of the state's jurisdiction for purposes of a personal judgment by means of appropriate substituted service.") (internal citations omitted). However, neither party argues that this basis for jurisdiction applies, so the Court need not analyze whether Obenstine is domiciled in California.

LINK: 24, 26, 28

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 11-03480 GAF (CWx) | Date | October 24, 2011 |
|---|---|---|---|
| Title | James Estakhrian v. Mark Obenstine et al | | |

No. SACV 09-230 DOC (Ex), 2010 WL 370336, at *5 (C.D. Cal. 2010) ("[L]ack of knowledge is certainly relevant to a ratification argument.").

Here, Plaintiff argues that Jackson was Obenstine's agent by ratification, that Obenstine purposefully availed himself of the privilege of conducting activities in California by soliciting business in California through Jackson, and that Obenstine benefitted from these California contacts in the form of significant attorneys' fees. (Opp. Obenstine at 8-10.) To prove this agency relationship, Plaintiff provides a sizeable amount of his own personal correspondence with Jackson and Jackson's postings on her website. The proffered evidence shows that Jackson solicited Plaintiff's involvement in the lawsuit from the outset, and then continued to encourage his involvement: she initially called Plaintiff to inform him about the lawsuit, forwarded him Obenstine's engagement letter, and then checked on Plaintiff to ensure that he had signed the letter and sent his check to Obenstine. (Estakhrian Decl. ¶¶ 4–8, Exs. 1–4.) To show Obenstine's ratification of Jackson's actions, Plaintiff asserts that Obenstine ratified Jackson's conduct by accepting all the clients that Jackson solicited. (Opp. Obenstine at 9–10.) Plaintiff also produced an e-mail in which Obenstine encouraged the class to visit Jackson's website, where Jackson vouched for Obenstine's prowess as an attorney. (Estakhrian Decl. ¶ 9, Ex. 7; see also Compl. ¶ 23.)

Obenstine counters that he never solicited clients, and that his first contact with Plaintiff was when Plaintiff solicited his services, namely through the sending to Nevada of the signed retainer agreement. (Rep. Obenstine at 6; Mem. Obenstine, Declaration of Mark Obenstine [Obenstine Decl.] ¶ 6.) Obenstine argues that Plaintiff has "no evidence" to prove any of Plaintiff's agency allegations. (Rep. Obenstine at 6), but this is an overstatement—Plaintiff has provided some evidence, however flimsy it may be, in the form of the aforementioned communications and Obenstine's acceptance of Plaintiff as a client, which arguably ratified Jackson's conduct. Further, Obenstine does not contest Jackson's conspicuous absence from the list of Cosmopolitan condominium purchasers, nor does he dispute the Plaintiff's allegation that Jackson has the same phone number as a former client. Accordingly, the Court must take Plaintiff's factual, non-conclusory allegations as true on their face, because Defendant has not controverted them. Unocal Corp., 248 F.3d at 922.

However, the problem with Plaintiff's claimed agency-by-ratification relationship between Obenstine and Jackson is that there is one element missing that would make the assertion factual rather than conclusory: there is no "smoking gun" that would fully link Obenstine with Jackson, one that shows Obenstine's knowledge of Jackson's solicitation of California residents. Plaintiff does show, in part, that Obenstine ratified Jackson's conduct by accepting the clients, but Plaintiff does not conclusively show that Obenstine knew that Jackson

LINK: 24, 26, 28

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 11-03480 GAF (CWx) | Date | October 24, 2011 |
|---|---|---|---|
| Title | James Estakhrian v. Mark Obenstine et al | | |

solicited the clients. Therefore, Jackson's solicitation in California cannot be imputed to Obenstine, and Plaintiff has not adequately alleged purposeful availment. However, as discussed <u>infra</u>, Plaintiff's showing is sufficient to entitle him to limited jurisdictional discovery.

### 2. MAC DEFENDANTS

#### a. *General jurisdiction*

Like Obenstine, the MAC Defendants have not engaged in the sort of continuous and systematic business contacts with California that would permit the Court to exercise general jurisdiction. Indeed, the MAC Defendants' alleged contacts with California are even more attenuated than Obenstine's contacts. Plaintiff identifies two such contacts with California: the fact that two attorneys at the MAC Firm are licensed to practice law in California, and the fact that the MAC Firm once published a newsletter giving legal advice to California residents. (Docket No. 34 [Opp. MAC] at 11.) Plaintiff imputes these contacts to Coffing by virtue of his status as president and managing partner of the MAC Firm, without citing any legal authority for this proposition. (<u>Id.</u> at 11–12.) These limited contacts are not "substantial, continuous, and systematic," <u>Mavrix Photo, Inc. v. Brand Technologies, Inc.</u>, 647 F.3d 1218, 1224 (9th Cir. 2011), such that they approximate physical presence in the state of California. First, neither licensed attorney has appeared on behalf of a client in any proceeding before a court in California, and neither actively solicits clients in California. (Docket No. 42 [Rep. MAC] at 3.) In itself, maintaining a license to practice law in California does not provide sufficient contact with California to justify the exercise of general jurisdiction. <u>Crea v. Busby</u>, 55 Cal. Rptr. 2d 513, 516 (Ct. App. 1996). Second, the newsletter article is more than six years old, and is the sole article relating to California that the MAC Defendants have ever published. (Rep. MAC at 3–4.) In short, these contacts are minimal at best, and the Court cannot exercise general jurisdiction over the MAC Defendants.

#### b. *Specific jurisdiction*

Plaintiffs make a more convincing argument that the Court may exercise specific jurisdiction over the MAC Defendants. The crux of Plaintiffs' argument is that the MAC Defendants purposefully availed themselves of the privilege of conducting activities in California by soliciting business in California through their agents, Obenstine and Kay Jackson, and thereby benefitted, in that: (1) the vast majority of their clients in the Cosmopolitan action were California residents; and (2) the vast majority of their fees were received from California residents. (Opp. MAC at 13–14.) Plaintiffs also point to the fact that the MAC Defendants repeatedly communicated with California residents from Nevada via telephone, fax, e-mail, and

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 11-03480 GAF (CWx) | Date | October 24, 2011 |
|---|---|---|---|
| Title | James Estakhrian v. Mark Obenstine et al | | |

written correspondence. (Id. at 13.) Plaintiff notes that the MAC Firm was explicitly listed on Obenstine's retainer agreement, as an associated law firm that was entitled to receive one third of the attorneys' fees recovered in the Cosmopolitan action. This retainer agreement was forwarded to Plaintiff in California. (Id. at 14.)

Plaintiff argues that Sher is inapplicable because Plaintiff's involvement in the Cosmopolitan action was solicited by the MAC Defendants through their agents: Obenstine and Jackson. Again, Plaintiff asserts that the MAC Defendants had an agency relationship with Jackson only by ratification. (Opp. MAC at 15.) As with the alleged agency relationship between Jackson and Obenstine, there is no evidence of the MAC Defendants' knowledge of Jackson's activities that would create an agency relationship by ratification. (Rep. MAC at 6-7.) Although Jackson did, in one instance, post on her web site an "FAQ" disseminated by the MAC Defendants, Plaintiff has produced no evidence that the FAQ was given to Jackson by the MAC Defendants; Jackson could have, for example, taken it herself from the MAC Firm's website, or received it from Obenstine.

Because Plaintiff lacks evidence showing the MAC Defendants' knowledge of Jackson's solicitation, Plaintiff asks the Court to impute Jackson's contacts with Plaintiff and other class members to Obenstine, and then to impute Obenstine's contacts to the MAC Defendants, using the logic of Daynard v. Ness, Motley, Loadholt, Richardson & Poole, 290 F.3d 42 (1st Cir. 2002). (Opp. MAC at 15-16, 17-18.) In Daynard, a law professor served as an expert witness for two law firms that he understood to be working jointly in a lawsuit against tobacco companies. Id. at 45-46. After the litigation concluded, he sued the firms to recover legal fees that he alleged the two firms had promised him if they prevailed in the litigation. Id. at 46-49. One of the law firms moved to dismiss for lack of personal jurisdiction, asserting that it never solicited the law professor's involvement, owned no property in the forum state, and did not know of the other firm's solicitation or meetings with the professor. Id. at 49. The court held that because the two law firms held themselves out as "part of a joint venture or other agency relationship," they were estopped from denying such a relationship; moreover, the Court found agency by ratification, because the movant law firm had ratified the soliciting law firm's acts for some time by accepting the professor's services and paying him for them. Id. at 56-60.

Plaintiff argues that here, as in Daynard, the MAC Defendants may be considered to have solicited Plaintiff and other class members in the Cosmopolitan action, because they held themselves out as engaged in a joint venture with Obenstine. The MAC Firm appeared on Obenstine's retention letters as being entitled to one third of the legal fees in the Cosmopolitan action, and Coffing himself was copied on an e-mail from Obenstine that welcomed Plaintiff to the Cosmopolitan class. (Docket No. 37 [Estakhrian Decl.] ¶ 9.) Further, when Obenstine's

LINK: 24, 26, 28

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 11-03480 GAF (CWx) | Date | October 24, 2011 |
|---|---|---|---|
| Title | James Estakhrian v. Mark Obenstine et al | | |

retainer fee was partially remitted to Plaintiff, the MAC Firm issued the check.  (<u>Id.</u> ¶¶ 11, 14.)
Plaintiff asserts that the MAC Defendants ratified Obenstine's conduct in that they accepted all
the clients and received legal fees and a portion of each retainer fee.  (<u>Id.</u> ¶ 14.)

     The Court declines to find specific jurisdiction in this case, following the <u>Daynard</u> logic.
The present factual allegations are one step removed from the factual pattern <u>Daynard</u>.  In
<u>Daynard,</u> the law firm that performed the solicitation was clearly linked to the movant law firm,
creating only one degree of separation between the solicitation and the moving law firm.  By
contrast, here, Plaintiff argues that Obenstine solicited Plaintiff and the other class members
through Jackson.  As discussed <u>supra</u>, Plaintiff has not established an agency relationship
between Obenstine and Jackson.  Imputing Jackson's California contacts one step further to the
MAC Defendants in order to exercise personal jurisdiction over the MAC Defendants would
stretch the limits of due process.  Thus, Plaintiff has also failed to adequately show a prima facie
case of purposeful availment, as to the MAC Defendants.  However, Plaintiff has made an
adequate showing that would entitle him to limited jurisdictional discovery.

**C. JURISDICTIONAL DISCOVERY**

     Plaintiff requests limited jurisdictional discovery in the event that the Court does not find
a prima facie case of personal jurisdiction.  (Opp. MAC at 21–22.)  Having found that Plaintiff
has not adequately alleged such a prima facie case, the Court **GRANTS** Plaintiff's request.

     Jurisdictional discovery is appropriate "where pertinent facts bearing on the question of
jurisdiction are controverted or where a more satisfactory showing of the facts is necessary."
<u>Boschetto v. Hansing</u>, 539 F.3d 1011, 1020 (9th Cir. 2008).  The plaintiff must show "some
evidence" that would establish personal jurisdiction; this standard is less demanding than the
Rule 12(b)(2) standard.  <u>Mitan v. Feeney</u>, 497 F. Supp. 2d 1113, 1119 (C.D. Cal. 2007).  "A
denial of discovery is proper 'when it is clear that further discovery would not demonstrate facts
sufficient to constitute a basis for jurisdiction.'" <u>Razore v. Tulalip Tribes of Washington</u>, 66 F.3d
236, 240 (9th Cir. 1995) (quoting <u>America West Airlines, Inc. v. GPA Group, Ltd.</u>, 877 F.2d
793, 801 (9th Cir. 1989)).

     Here, the Court requires a more satisfactory showing of jurisdictional facts, in order for
the Court to exercise personal jurisdiction over Defendants.  Plaintiff has indeed shown "some
evidence" to support an agency relationship between Obenstine and Jackson, and to support
an imputation of any proven solicitation by Obenstine to the MAC Defendants.  It is clear that
further discovery could indeed show facts sufficient to connect all of the Defendants in the
instant case to Jackson; for example, Plaintiff states that it will request documents from the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 11-03480 GAF (CWx) | Date | October 24, 2011 |
|---|---|---|---|
| Title | James Estakhrian v. Mark Obenstine et al | | |

MAC Defendants regarding their contacts and communications with co-counsel about the case. (Opp. MAC at 21.)

Accordingly, the Court **GRANTS** Plaintiff's request for jurisdictional discovery. The period of jurisdictional discovery will commence with the date of this order and conclude on January 20, 2012, at the close of business. The motions are DENIED, to be re-noticed for hearing if necessary.

**IT IS SO ORDERED.**